STATE v. HESTER *ET AL.*

(134 S. E., 885)

1. CRIMINAL LAW.—In homicide case, refusal of continuance, sought on grounds of unfavorable public opinion, and that defendants had not had sufficient opportunity to prepare for trial, *held* not abuse of discretion.

2. CRIMINAL LAW.—The matter of granting and refusing continuances is within discretion of trial Court.

3. CRIMINAL LAW.—Supreme Court will not hold refusal of continuance was error, unless satisfied that there has been legal abuse of discretion.

4. CRIMINAL LAW—FAILURE TO REPEAT TO JURY TESTIMONY HEARD BY COURT IN ABSENCE OF JURY, AND HELD COMPETENT, HELD NOT PREJUDICIAL ERROR.—In homicide case, where Sheriff and others in absence of jury, gave testimony as to conversations between defendants heard by use of dictaphone or detectaphone, which Court held competent, *held* failure to have such testimony repeated to jury was not prejudicial error, where it was cumulative of other testimony heard by jury, and was absolutely opposed to position defendants were taking.

5. CRIMINAL LAW.—Jury is entitled to hear all competent testimony presented, and failure to give it such opportunity is generally prejudicial error.

6. CRIMINAL LAW.—One asking review of his conviction of capital offense will not be held to strict technicalities of the law.

7. CRIMINAL LAW.—Testimony as to conversations between defendants, overheard by use of dictaphone or detectaphone, *held* admissible.

---

NOTE: Discretionary power of Court to grant continuance. 6 R. C. L., 544; 2 R. C. L. Supp., 153; 5 R. C. L. Supp., 354.

Allowance of leading questions to witness as within discretion of trial Court, see 28 R. C. L., 590; 3 R. C. L. Supp., 1584; 5 R. C. L. Supp., 1546.

8. CRIMINAL LAW.—Admissions and declarations of accused are not incompetent because received over telephone or detectaphone, where witness recognized voice, or testimony as to identity of voice is insufficient to carry question to jury.

9. CRIMINAL LAW.—That witnesses who listened at dictaphone or detectaphone could not repeat whole of four-hour conversation *held* not ground for excluding testimony as to parts of conversation which they had heard and could positively testify to.

10. CRIMINAL LAW.—Testimony as to statements of defendants heard by use of dictaphone or detectaphone *held* not inadmissible on ground that such statements were not free and voluntary.

11. CRIMINAL LAW.—Testimony as to defendants' statements heard by use of dictaphone or detectaphone *held* not incompetent because officers had in a way entrapped defendants, and by artifice enabled themselves to hear their talk.

12. CRIMINAL LAW—TESTIMONY AS TO STATEMENTS BY ONE DEFENDANT, MADE WHEN HE REALIZED THAT CONVERSATIONS BETWEEN HIMSELF AND CODEFENDANTS HAD BEEN HEARD OVER DICTAPHONE, HELD NOT INADMISSIBLE AS NOT FREE AND VOLUNTARY.—Where officers, after listening over dictaphone for several hours to conversations of three defendants, brought one of such defendants to place where listening apparatus is located, and permitted him to listen in on conversation of his codefendants and jailer, *held* testimony as to statements made by him at such time were not inadmissible as not free and voluntary.

13. CRIMINAL LAW—ADMISSION OF TESTIMONY NOT RESPONSIVE TO QUESTION ASKED HELD NOT ERROR, WHERE THERE WAS NO MOTION TO STRIKE OR FOR COURT TO INSTRUCT JURY TO DISREGARD.—Admission of testimony that one defendant seemed "very scared," but that his codefendants were "tough enough," when they learned that their convesation had been heard over dictaphone, *held* not error as to latter, in that answer was not responsive to question, where there was no motion to strike or for Court to instruct jury to disregard.

14. CRIMINAL LAW.—In homicide case, Sheriff's testimony as to money found at home of one defendant *held* not inadmissible on theory that it clearly indicated witness' opinion that such money was money taken from deceased.

15. WITNESSES.—Permitting asking of leading questions is very much within discretion of trial Judge.

16. CRIMINAL LAW—ADMISSION OF HEARSAY TESTIMONY OF OFFICER AS TO STATEMENTS OF DEFENDANT'S WIFE HELD NOT PREJUDICIAL.—In homicide case, admission of hearsay testimony of officer concerning conversation had with defendant's wife while looking for

money concerning which defendant had made statements *held* not prejudicial, in view of Court's interference and caution to jury to disregard.

17. CRIMINAL LAW—HOMICIDE—TESTIMONY THAT ONE DEFENDANT HAD SAID HE WOULD NOT PUT THE OFFENSE CHARGED PAST HIS CO-DEFENDANTS, THAT THEY WERE MEAN ENOUGH TO DO IT, HELD INADMISSIBLE, WHERE DEFENDANTS' REPUTATIONS WERE NOT IN ISSUE, THOUGH THE STATEMENT WAS REPEATED TO A CODEFENDANT BUT HIS REACTION WAS NOT SHOWN.—In prosecution of father and two sons for murder, admission of testimony that one son, when asked if he thought that his father and brother, then under arrest, had killed deceased, replied, "I would not put it past them, they are mean enough to do it," *held* error, defendants not having put their reputations in issue nor was such testimony competent, though statement was repeated to another defendant, in absence of showing of his reaction thereto.

18. CRIMINAL LAW.—Statement by one defendant that he would not put the offense charged past his codefendants, and that they were mean enough to do it, *held* inadmissible as a statement attempting to inculpate his codefendants and excuse himself.

19. WITNESSES.—Where defendant testified that he was sick, and con-fined to his home at time of homicide, cross-examination as to habits of intemperance for purpose of showing that any indisposition was due to use of liquors *held* not improper.

20. CRIMINAL LAW.—In homicide case, admission of officer's testimony as to conduct of defendants, then under arrest, when affidavit inculpating them was read to them, and when directly accused by affiant, also involved in same offense, *held* reversible error.

21. CRIMINAL LAW.—In homicide case, reading to jury affidavit of one involved in same offense, which inculpated defendants, *held* violative of defendant's right of confrontation under Const. Art. 1, § 18, and Const. U. S. Amend. 6.

22. CRIMINAL LAW.—In homicide case, charge as to confessions and implied confessions *held* erroneous as indicating that Judge thought accused should not have remained silent when inculpating affidavit was read and when directly accused.

23. CRIMINAL LAW.—Right of Court to use reported cases in illustrating to jury principles of law applicable to case on trial does not permit Court to use facts of reported cases as an illustration in his charge.

24. HOMICIDE—TESTIMONY AS TO NOISES HEARD OUTSIDE DECEASED'S STORE ON NIGHT OF HOMICIDE HELD ADMISSIBLE.—In homicide case, where it was State's theory that deceased was killed shortly after leav-

ing store, admission of testimony that witness in store on night of homicide heard noise as of some one ascending steps to store, but that no one entered or was heard to leave, *held* not error.

25. CRIMINAL LAW.—Generally, testimony as to conversation between deceased and third party, in the absence of accused, is inadmissible, except under *res gestœ* rule.

26. CRIMINAL LAW.—Admission of testimony under *res gestœ* rule is very much within discretion of presiding Judge.

27. HOMICIDE.—In homicide case, where deceased was shown to have been robbed, testimony as to habit and custom of deceased on closing store of putting money into shot bags, and placing bags of money in grip or hand bag, *held* admissible.

28. WITNESSES.—In homicide case, permitting witnesses to testify that they were not working for any reward *held* not error.

29. CRIMINAL LAW.—In homicide case, permitting witnesses to testify that they had heard that other witnesses were not to receive rewards *held* improper, but not prejudicial, in view of each witness' own similar testimony.

30. CRIMINAL LAW.—In homicide case, where inculpating affidavit of one involved in same offense was used against defendants, refused to permit defendants to question detective as to circumstancs under which it was obtained *held* error.

31. CRIMINAL LAW.—In homicide case, asking of question on cross-examination whether defendant's wife had not been witness for him when arrested and tried for arson *held* not prejudical error; objection having been sustained.

32. CRIMINAL LAW—INSTRUCTION AS TO PROOF REQUIRED OF CIRCUMSTANCES RELIED ON BY STATE HELD NOT ERRONEOUS.—Instruction that, when State relies on circumstantial evidence, every circumstance must be made out beyond a reasonable doubt, "that is, all the circumstances on which the State relies upon," but not every circumstance that comes up in the case, *held* not erroneous.

33. CRIMINAL LAW.—Whole charge must be considered in determining whether it contains harmful error.

34. CRIMINAL LAW—INSTRUCTION AS TO GUILT OF AIDERS AND ABETTORS HELD NOT ERRONEOUS AS OMITTING REFERENCE TO DIFFERENT DEGREES OF OFFENSE, IN VIEW OF OTHER INSTRUCTIONS.—In homicide case, instruction that, if part of defendants aided and abetted in attack on deceased, they would be as guilty as one who did actual shooting, *held* not objectionable as omitting to State that parties might be convicted of different grades of homicide, in view of other instructions.

35. CRIMINAL LAW—INSTRUCTION AS TO BURDEN ON DEFENDANT AS TO SUSTAINING DEFENSE OF ALIBI HELD NOT ERRONEOUS.—Instruction as to burden on defendant of sustaining defense of alibi *held* to make it sufficiently clear that defendants were entitled to acquittal, if jury had reasonable doubt of their guilt, even though they had failed to establish plea of alibi by preponderance of evidence.

36. CRIMINAL LAW.—Instruction as to jury's duty to render true verdict according to law and evidence, though containing statement "honest conviction never comes to a man because he wants it to come," *held* not legally erroneous.

Before RICE, J., Greenville, January, 1925. Reversed and remanded for new trial.

Jerry M. Hester and others were conviced of murder, and they appeal.

The following is the statement of J. C. Floyd referred to in the opinion:

"On Saturday, December 20, 1924, I was in the employ of Mr. J. Ed Thackston, working for him on the farm— milking the cows and other things. I was around home all day until the afternoon when I went to the store, and there I saw Mr. Ed Thackston in his store attending to his duties. I stayed there in the store with Mr. Thackston until about 4:30 p. m., when I left there and went to the dairy to milk the cows. I got there, and there I met Frank Morris, colored, and we milked six cows, getting through about 5 o'clock p. m., when I left the dairy and went on back up the road, passing the store of Mr. Thackston, and went on over the hill to Mr. Jerry Hester's house. Upon my arrival there I saw Mr. Jerry Hester and his wife, Mrs. Hester, and Mr. Hester and I went to the front porch and sat down to talk. In this conversation Mr. Jerry Hester, he told me, 'Well, Charlie is back home now and Mr. Thackston will be done away with.' Then he (Mr. Hester) asked me if I was going back to the store that night, and I replied, 'I dont know whether I will or not.' Then he said, 'I need a little soda,' and with this he sent out

to my house to borrow some; his son, Cromo, going with me when I left after it. While we were sitting there talking, and the above conversation passed between us, Mr. Hester said that when I went to the store to get Mr. Thackston back that he would be hid at the brick store, which is located right at the railroad crossing, and that Charlie Hester would be in the dairy yard, and they meant to whip him. After getting a pound of butter from Mrs. Hester, paying her for same, I and the boy sent by Mr. Hester went on to my house, and the object in this boy going with me was for me to see when I got home if there was any excuse for me to have to go to the store, so that I could get Mr. Thackston out for them to whip him. When we got to the house I gave the boy the soda, and went on to the store, believing that he would tell his father, Mr. Hester, that I had gone, and that they would get ready to do their bit when I got Mr. Thackston back to the store, and they could get placed, as had been agreed. I went on to the store, as had been agreed, and when I got there I saw that the store was closed up, and that Mr. Thackston had gone home, and I went right on over the railroad just below the entrance to Mr. Ross's house, and there I whistled for Mr. Thackston, knowing that he would come back to the store for me, for I had heretofore made arrangements with him that on account of us at home expecting a new baby that I was to call the doctor over his 'phone, and as soon as he heard my whistle he came right on over to the store. He had his money bag with him at this time; that is to say, that when I called him back, as had been agreed with us, he had it with him. When we got to the store, I knew that Mr. Hester was hid at the brick store, as he told me that he would be there, and he had had plenty of time to get there, so when Mr. Thackston got to the store I asked him to let me have some matches. He opened the store, and we both went in; he turning on the lights. He gave me the matches, a five-cent box, and I paid him for them. After I made this purchase, he (Mr. Thackston) asked me 'if I would not go

back home with him,' and I told him that I would, and with this I stepped out of the door, leaving him just a short distance behind me, and when I got to the door I stepped down the three steps to the ground, and there stood Mr. Jerry Hester with a shotgun up to his shoulder and told me, 'Run, Floyd,' and with this I ran off up the road towards home. Charlie Hester, his boy, was standing right there beside him when this was done. When I left at his command, Mr. Thackston had not come out of his store, and the store door was not locked, but he was only a short distance behind me. I ran on up the hill as I had been told to do, and went right on home. I had my supper after I got home. As I went on up the hill running, I got to the crossroads and I passed a man, and I think that this man was Claude Hester, as this man was the same build as Charlie Hester. On leaving the Hester house that afternoon, after I had talked to Mr. Hester, and the plans had all been arranged, and as I was coming out the path towards my house, I met Charlie Hester, and he told me that he would be in the dairy yard that night when I got Mr. Thackston out back to the store, and that they meant to whip him. After I got home, I did not hear any more until about 12:20 a. m. Mr. Ross came to my house and asked me if Mr. Thackston was there, and I told him 'No.' I then knew that something bad had happened, although they did not tell me that they were going to kill him, only that they were going to whip him, but, after I learned that he had not gotten home, I knew that something bad had happened. I couldn't sleep any more, for I felt sure that Mr. Thackston had been killed, but I sat around the fire until 3 o'clock a. m., when I thought that I would go out and see what had happened, so I went away from my house, going through Mr. Hester's yard, and there was no one up, and I went right on through the yard, and went to the railroad tracks just where it was understood that Mr. Jerry Hester was to be hid, and then I went on up the railroad tracks toward Frank Morris's house, and a short

distance up the railroad tracks I found blood there. I then knew what had happened, and in place of these men whipping Mr. Thackston, as had been agreed, they had killed him, and my heart sank to my toes, but, in order to make sure that these men had killed him, I went on to Frank Morris's house to learn further, and when I got there I was told that they had found him on the railroad tracks dead. All that I knew to be in the gang was Charlie Hester, Jerry Hester, and Claude Hester, and, if there were any others, I did not know it, but I saw and recognized Jerry Hester and Charlie Hester as I came out of the store, for Jerry Hester put a gun on me, and told me to 'run,' and I did run, for all that was expected of me was to get Mr. Thackston back to the store where they could whip him. Charlie Hester was to do the whipping, for he did not like Mr. Thackston, for some time ago Mr. Thackston sat on a jury that convicted Charlie Hester for transporting whiskey, and he and his father had always said that Mr. Thackston hung the jury on him. This is all that I know about the killing; and, when it was all planned, it was understood that after I got Mr. Thackston back to the store they were not to kill him, but to whip him, and I was not there when the killing took place, as I had done my part and ran home. After the killing of Mr. Ed Thackston, I had a conversation with Jerry Hester, and he asked me if I was ever going to tell this, and he told me that if I ever told it that they would kill me.

"Some time before the killing of Mr. Ed Thackston, Mr. Jerry Hester was at my house, and he was making threats against Mr. Thackston, and he said that he would kill anybody who ever told that he made threats, for some day he would kill Mr. Thackston.

"After Claude Hester was arrested, I had another conversation with Mr. Jerry Hester, and he told me that he did not know how much money Claude had on him when arrested, nor did he know how much he had.

"This statement is made of my own free will and accord, and I have not been promised, nor have I received, anything for the making of this confession, and there has been no duress or rough treatment given me; I have not been beat or threatened, but I make this confession free and voluntarily, of my own free will and accord."

The following is a portion of Court's charge:

"Now, gentlemen, I want to talk to you just a little bit about confessions or alleged confessions, because I am not telling you that these defendants confessed anything in this case. There are certain situations sometimes confronting a man where it is his duty to speak. If he is charged with a crime, the law says that he cannot stand up and keep his mouth shut, but it must be under such circumstances that it would be his duty to speak and deny the charge. Now, I am going to read to you, in order to get it clear in your mind, an extract from one of these reports here—it is not very long—which sets out probably clearer than anything I could say to you, and in passing on this, gentlemen, you have got to take into consideration all the circumstances surrounding the man at the time that the charge is made against him. He might be in such a situation that he might say, 'Well it is no use for me to say anything,' and again he might be in such a situation that the law says you must deny it if you are not guilty. Now, I want you to pay strict attention to this, because it is an important matter. The rule on the subject of acquiescence in the statement made by another, implied by his silence, is thus stated in 1 Greenleaf, § 197: 'Admissions may also be implied from the acquiescence of the party. But acquiescence, to have the effect of an admission, must exhibit some act of the mind, and amount to voluntary demeanor of conduct of the party. And, whether it is acquiescense in the conduct or in the language of others, it must plainly appear that such conduct was fully known, or the language fully understood by the party, before any inference can be drawn from his passive-

ness or silence.' Some ignorant person, some ignorant Negro, in the presence of five or six officers, may be charged with a crime, and it may be that, not knowing his rights, not knowing that he is expected to say anything, he might stand silent. Well, now, in passing on these facts we must take into consideration, you have got to take into consideration the surrounding circumstances as to whether under the conditions the party should not have asserted his innocence of the charge. Now, I will go on and read this to you: 'The circumstances, too, must be not only such as afforded him an opportunity to act or speak, but such, also, as would properly and naturally call for some action or reply, from men similarly situated.' The same author expresses the further view, which we think has been generally recognized as sound: 'But in regard to admissions inferred from acquiescence in the verbal statements of others, the maxim,' and here is some Latin which I don't know what it means, 'Is to be applied with careful discrimination. Nothing, it is said, can be more dangerous than this kind of evidence. It should always be received with caution; and never ought to be received at all, unless the evidence is of direct declarations of that kind which naturally calls for contradiction.' And it is for you to say in this case, gentlemen, whether that kind of situation is presented to you. 'Some assertion made to the party with respect to his right, which by his silence, he acquiesces in.' Two questions always arise as to the effect of silence under accusation. First, are the circumstances surrounding the accused such as to make his silence of any significance at all? In other words, does it mean anything under the circumstances? Does his silence mean anything? 'This is a question of fact to be decided by the Circuit Judge, and his conclusion will not be disturbed by this Court unless without any reasonable support. Was the accused aware that he had a right to speak?' Now, this was passed on first by me, gentlemen, in submitting the case to you, and now I am going to

submit the matter to you. In my judgment, I allowed the evidence to come in; sufficient for me to submit it to you. 'Was he overwhelmed by fear or distress, or the belief that nothing he could say would avail? These and perhaps many other matters it may be necessary for the Circuit Judge to consider before allowing the testimony to go to the jury as worthy of any consideration. The second question is as to the degree of consideration to be given and value to be attached to the evidence of silence is for the jury, and into this question all the peculiar circumstances enter as most material factors.'

"Now, I want to say further to you, gentlemen, that any alleged confessions or statements made by any one of these defendants is not binding upon that other, unless the other defendant was there and acquiesced in it. In other words, what one of them said at one time while the other was not present is not evidence against that other, and cannot be taken against him. If he was present and acquiesced in it, then it is a question of fact for you to say did he or not acquiesce in it and whether or not such statements are to be taken against them. Now, again, gentlemen, as I told you, this case covers a considerable range. I want to say to you that statements made by a party under duress, or a confession made under duress, are not admissible. In some of these matters submitted to you, and which I allowed to go before you, there was a question as to whether or not the evidence should come in. Well, in my judgment I thought it should come in, and admitted it. That was a question primarily for me to pass on, for the Court to pass on, but, there being in some instances evidence on both sides of that question, why I am going to submit it to you: Was any confessions or statements made free and voluntary? Whatever they were, if they were against the defendant, they can be used against him in Court, and you are to take them into consideration. If you are satisfied that in those contested cases, where there is evidence on both sides

of that question, that they were not free and voluntary, but
were brought about by the pressure brought to bear illegally
by the officers, that is, duress, fear, putting him in fear,
and so on, I say, gentlemen, if you are satisfied that in any of
those cases where those matters come before them, then dis-
regard whatever they said under those conditions. If not,
then take it and consider it in passing upon this case and in
deciding whether or not the State has made out her case."

*Messrs. L. E. Wood* and *J. D. Lanford,* for appellants,
cite: *Accused and his counsel entitled to reasonable time
to prepare for trial:* 1 S. C. L., 1; 16 C. J., 449. *Evidence
obtained by eavesdropping on accused:* 266 U. S., 1. *Hear-
say rule:* 131 S. E., 603; 106 S. C., 392. *"Confession" de-
fined:* 118 S. C., 99; 36 S. C., 524; 3 A. & E. Enc., 438;
Wharton on Crim. Ev., 9th Ed., Sec. 632. *Confession of
one accused not binding on codefendant:* 129 S. C., 77; 121
S. C., 443; 75 S. C., 477; 16 S. C., 453. *Statement of co-
defendant accusing another and exculpating himself inad-
missible:* 109 S. C., 142; 49 S. C., 410; 48 S. C., 136; 36
S. C., 524. *Accused to be confronted by witnesses against
him:* 131 S. C., 603. *Statements of accused secured by de-
ception not voluntary; incompetent if denied:* 94 S. C., 439;
266 U. S., 1. *Same; silence not evidence of guilt:* 94 S. C.,
439; 47 S. C., 170; 32 S. C., 392; 13 S. C., 30; 266 U. S., 1;
16 C. J., 633. *Confession only admissible against one making
confession:* 24 S. C., 114; 15 S. C., 540. *Admissibility of evi-
dence of secret habit of defendant:* 224 Mass., 135; 112
N. E., 654; 85 S. E., 606; 91 A., 797; 124 Md., 191; 91
A., 800; 148 N. W., 666; 168 S. W., 772; 11 L. R. A., 75.
*Attack on cross-examination on defendant's character not
in issue improper:* 131 S. E., 603. *Jury finally to determine
whether confession is to be considered:* 128 S. C., 386; 117
S. C., 470; 115 S. C., 506; 99 S. C., 504; 99 S. C., 221; 93
S. C., 149; 87 S. C., 407; 81 S. C., 374; 58 S. C., 112; 36
S. C., 524; 15 S. C., 540; 13 S. C., 389. *Burden on State*

*to show confession voluntary:* 99 S. C., 504. *Absence of competent evidence tending to prove guilt is ground for directed verdict:* 132 S. E., 613; 130 S. E., 641; 127 S. C., 392; 116 S. C., 210. *Corpus delicti and guilt of accused provable by circumstantial evidence:* 120 S. C., 536; 73 S. C., 318; 68 S. C., 53; 66 S. C., 23; 56 S. C., 524; 49 S. C., 242. *Requirements for proof by circumstantial evidence:* 120 S. C., 536; 79 S. C., 97; 75 S. C., 409; 68 S. C., 53; 36 S. C., 394; 66 S. C., 23; 56 S. C., 524; 49 S. C., 242; 38 S. C., 348; 15 S. C., 403. *Joint defendants may be convicted of different degrees of crime:* 1 Bay, 488; Archibold's Crim. Pl. & Pr., 7th Ed., 825; 1 Bishop's New Crim. Pro., 2d Ed., 897; Clerk's Crim. Pro., 307; 3 Russel on Crimes, 6th Ed., 141; 1 Starkie's Crim. Pl., 37; Wharton's Crim. Pl. & Pr., Sec. 755; Wharton on Homicide, 3d Ed., 51. *Presumption of innocence of accused:* 116 S. C., 114. *Accused cannot be made to testify against himself:* Const. 1895, Art. 1, Sec. 17. *Silence in face of charges as evidence of guilt:* 127 S. C., 107; 94 S. C., 442; 74 S. C., 501; 32 S. C., 401; 13 S. C., 31; 7 Crim. Rep. (Okla.), 685; 127 P., 264. *Same; after arrest:* 7 Crim. Rep. (Okla.), 685; 127 P., 264; 46 Am. Dec., 672; 13 Allen, 570; 55 Tex. Crim. Rep., 527; 25 R. I., 123; 11 N. W., 675; 106 La., 407; 102 Mo., 142; 174 U. S., 53; 232 F., 267; 200 F., 499. *"Support" defined:* 130 S. E., 337. *Court may read to jury law taken from other decided cases:* 132 S. E., 811. *New trial proper where evidence insufficient to convict:* 132 S. E., 613.

    *Messrs. J. G. Leatherwood, Solicitor,* and *Bonham, Price & Poag* and *D. W. Smoak,* for respondent, cite: *Defendants and counsel had sufficient time to prepare for trial:* 110 S. E., 250. *Errors not objected to during trial waived:* 126 S. C., 437; 120 S. E., 230; 83 S. C., 87. *Voluntary nature of confession is finally question for the jury:* 130 S. C., 512. *Admissibility of confessions obtained by deception:* 107 Ala., 108; 18 So. 284; 2 App., D. C., 35; 14 Minn., 105; 95 Mo., 199; 8 S. W., 221; 92 Mo., 542; 5 S. W., 257; 84

Mo., 278; 74 Mo., 128; 20 Neb., 492; 30 N. W., 626; 57 Am. Rep., 835; 115 N. C., 706; 20 S. E., 175; 61 N. C., 447; 3 Brewst., 461. *Statement of defendant not in presence of co-defendants admissible only against him:* 15 S. C., 540. *Silence in face of charges as evidence of guilt:* 74 S. C., 500; 69 Ga., 37; 47 Am. Rep., 748; 132 Ind., 317; 31 N. E., 536; 74 Ia., 653; 38 N. W., 525; 10 Ia., 81; 7 Ia., 287; 7 Ia., 347; 55 Miss., 436; 7 Mo. App., 32; 7 N. Y. St. Rep., 217; 118 N. C., 1161; 24 S. E., 495; 96 Tenn., 209; 33 S. W., 1046.

October 4, 1926.

The opinion of the Court was delivered by MR. JUSTICE BLEASE.

The defendants, Jerry M. Hester and his two sons, Charlie and Claude, were indicted and tried in the Court of General Sessions for Greenville County for the crime of murder; it being charged that they killed J. Ed Thackston on the night of December 20, 1924. A verdict of guilty was rendered as to all three of the defendants, and they were thereupon sentenced by his Honor, H. F. Rice, Circuit Judge, to suffer death by electrocution. From the judgment and sentence of the Court imposed upon them, they have appealed to this Court.

One J. C. Floyd was charged as being an accessory to the murder of Thackston, but he was not tried with the Hesters. Following the trial of the defendants herein, Floyd was tried and convicted of the crime of manslaughter. His case is not involved in this appeal.

We shall not attempt to set forth in full the facts relied upon by the State to show the guilt of the appellants; neither shall we detail the testimony for the appellants, by which they endeavored to establish their general plea of not guilty, and their defense of alibi. Under the circumstances, we think it best not to undertake a full review of the testimony, but will refer only to the testimony which we regard as bearing upon the exceptions which come to us.

The defendants, as appellants, make seventy-two exceptions, but the legal issues are not near so many. The Court will not pass upon each of the exceptions separately, but shall make an effort to cover the grounds of all of them in this opinion.

The appellants contend that there was grievous error in the refusal of the Presiding Judge to continue the trial, as requested by them, beyond the term of the Court at which the case was called. The defendants Charlie and Claude Hester were arrested on December 29, 1924. Jerry Hester was arrested on January 5, 1925. They were arraigned on January 12, 1925, and made the statement to the Court that they had not employed counsel, but that they thought they could do so. The case was then set for the following Thursday, and counsel were employed by the defendants the preceding day. On Thursday the defendants requested a continuance beyond the term on the ground that they had not had the time and opportunity to prepare for trial, and submitted affidavits in support of their motion. The request for continuance was refused, but the Judge ordered the case continued until Monday following, January 19th. On Monday, attention being called to the fact that the day was a legal holiday, the trial was postponed until the following day. At the call of the case for trial, on Tuesday, January 20th, counsel again moved for a continuance, urging the grounds formerly set forth, and the further ground that at the time it was unfair to the defendants to put them on trial, because of unfavorable public opinion against them. The Circuit Judge assured the defendants that they would be given all the assistance necessary for securing their witnesses, and refused the motion for continuance.

It is well settled in this State—so much so that there is no need to cite authority to support the proposition—that the matter of granting and refusing continuances is within the discretion of the Trial Judge. This

Court could not be warranted in holding that there was error in the refusal to grant the continuance asked for, unless we were satisfied that there had been a legal abuse of the discretion of the Judge. Circuit Judges are in much better position than this Court to determine if continuances should be granted. We do not find anything in the record here to show that Judge Rice abused his discretion in this instance, and all the exceptions as to bringing the defendants to trial are overruled.

When the defendants were first arrested, they were kept in separate places of confinement. C. A. Rector, then sheriff of Greenville County, T. E. Williams, a Pinkerton detective, and W. W. Rogers, State Constable, were then, and had been for several days, endeavoring to discover the parties guilty of the murder of Mr. Thackston. The officers named, with the help of some others, installed an instrument known as a dictaphone, or detectaphone, in certain cells of the jail, placing the receiving part of the instrument in the dining room of the jail. At the direction of Sheriff Rector, the jailer, Mr. Christopher, placed the three Hesters in adjoining cells, where they could talk to each other, and where the dictaphone was located. The jailor informed them that he had "slipped them up there" as a matter of kindness to them, that they might have the opportunity of discussing their case and arranging for their trial. The officers named, and one or two other gentlemen, located themselves in the dining room. From time to time one or more of the officers, and those who were assisting them, "listened in" on the dictaphone for some four or five hours. In the trial these officers testified as to various and numerous statements alleged to have been made by the defendants which they were able to hear over the dictaphone.

When Sheriff Rector was testifying as a witness, for the purpose of passing upon the admissibility of the "dictaphone testimony," the Presiding Judge had

the jury to retire from the courtroom.  During the absence
of the jury, Sheriff Rector related to the Court the manner
of operation of the instrument, the method of transmitting
sound thereover, the situation of the parties, and his ability
to recognize and distinguish the voices of the defendants.
The examination and cross-examination of Sheriff Rector,
at this time, was of considerable length.  The Circuit Judge
concluded that the testimony which the State was endeavor-
ing to bring out was competent and had the jury brought
back into Court.  The testimony which had been given by
Sheriff Rector during the jury's absence was not repeated
to them, and was not read over by the stenographer; and
no request that either of these things be done was made by
the solicitor or the attorneys for the defendants.  The
failure to do this is alleged to be sufficient cause to require
a reversal of the case.  Undoubtedly, if the testimony of
Sheriff Rector, while the jury was absent, was incompetent,
then it should not have been repeated by the witness, or read
by the stenographer, to the jury upon their return to the
courtroom.  The testimony, however, was held competent
by the Court.  The jury, of course, is entitled to hear all
competent testimony presented in the case, and the failure
to give the jury such opportunity is, generally, prejudicial
error.

The counsel for the respondent take the position that,
since defendants attorneys did not request the Court to have
the testimony repeated to the jury, and in no way called
attention to the matter, this, in a way, estops the defendants
from now raising objection.  They cite as authority the
case of *State v. Ballew,* 83 S. C., 82; 63 S. E., 688; 64 S. E.,
1019; 18 Ann. Cas., 569, wherein this Court said:

"The general principle that a party cannot take his chances
of a successful issue, reserving vices in the trial, of which
he has notice, for use in case of disappointment, is univer-
sally recognized and obviously just."

We cannot agree that the determination in the Ballew Case is applicable here. In that case the defendant was not charged with a capital offense. This Court has not held down to the strict technicalities of the law those who have been convicted of capital offenses, when they have asked a review of their trials. In the recent case of *State v. Bigham,* 133 S. C., 491, 131; S. E., 603, Mr. Justice Watts called attention to numerous authorities for this statement by the Court:

"It is not an open question any longer that in a capital case this Court will take notice of any error apparent on the record affecting the substantial rights of the accused, even though not made a ground of appeal."

Yet we cannot hold that the failure to have this testimony of Sheriff Rector read or repeated to the jury is sufficient error to effect a reversal, for two reasons. The first of these is, that before the jury retired from the courtroom, Sheriff Rector had given, in their presence, testimony covering substantially the same matters brought out in his evidence, when the jury was present; and, after the jury returned, the witness, in continuing his testimony, from time to time, gave sufficient evidence to cover the substance of the matters brought out by him in his statements in the absence of the jury; and he went over all his preliminary testimony taken in the absence of the jury on his cross-examination by counsel for defendants, when the jury was present. The second reason is, that another witness testified fully as to the construction and operation of the dictaphone, the situation of the parties and the ability of the witnesses to recognize and distinguish voices of persons talking within reach of the instrument, covering practically the same testimony along this line as was given by Sheriff Rector. Added to the reasons given, we think that, in any event, the failure to have the testimony taken in the absence of the jury read or repeated to them could not in any way have prejudiced the defendants. The State was endeavoring to establish

to the identity of the voice is sufficient to carry the question to the jury." 16 C. J. p. 628, par. 1246.

All through the receipt of the "dictaphone evidence," the Circuit Judge repeatedly cautioned the witnesses that they should only testify as to what they had heard when they were able to distinguish and identify the voices of the defendants. In some instances, the witnesses admitted because of confusion that they could not state positively the words spoken, and by whom spoken, and the judge ordered such testimony stricken out. While the "listeners in" made notes, it was repeatedly held by the Court that they could only testify from notes made by themselves, or could give only their own independent recollection of things they had heard said. The fact that the witnesses could not repeat the whole conversation of four hours in length would not be sufficient to hold that they could not give testimony as to the parts of the conversation which they had heard and were able, positively, to testify concerning. *State v. Murphy,* 48 S. C., 1; 25 S. E., 43. We do not think that the contention of the appellants that the witnesses only made notes of matters to the advantage of the prosecution is well taken, as many things stated by them as to statements made by the defendants could not have been construed as admissions of their guilt, but, to the contrary, as declarations of their innocence. Neither can we agree to the claim of the appellants that the statements alleged to have been made by them, heard over the dictaphone, were not free and voluntary. While the defendants were prisoners at the time of the alleged conversations between them, and while they had no idea that their conversations were being heard by others, those facts are not sufficient to cause us to say that the alleged admissions were not free and voluntary. The fact that the officers in a way "entrapped" the defendants, and by artifice enabled themselves to hear their talk, does not make their statements at the time incompetent as testimony. The record discloses,

that the dictaphone was reliable, and that it was easy for those who "listened in" to hear the words of the defendants and to distinguish their voices, while the defendants were seeking to show the contrary. The testimony of Sheriff Rector, given to the Court when the jury was not in the room, tended strongly to establish the view of the State; and we do not see how the defendants could possibly have suffered harm when the jury could not hear, and did not hear, evidence which was absolutely opposed to the position which they were taking.

Many of the exceptions urgently insist that the "dictaphone testimony," related by Sheriff Rector and other witnesses, should not have been admitted at all. The reasons assigned in these exceptions are: That the alleged statements were not free and voluntary; that the witnesses admitted that the whole alleged conversations were not heard or understood; that the transcript used by the witnesses as a basis of their testimony was made from a consolidation of notes taken by a number of persons, none of them hearing the whole conversation; that the witnesses admitted there was a confusion of voices of the defendants, and, therefore, an improper identity; that only notes of such matters as were of apparent advantage to the prosecution were taken, and other matters purposely disregarded; and that the testimony was too indefinite, too incomplete, confused, and uncertain to warrant its admission.

The dictaphone or detectaphone, like the telephone, is an electrical instrument, by means of which sound is heard at a greater distance than ordinarily it may be heard. The rule as to allowing the introduction of testimony of conversations of accused persons, heard by the means of these instruments, is as follows:

"The admissions and declarations of accused are not incompetent because they were received over a telephone or detectaphone, whereby witness receiving them can testify that he knew and recognized his voice, or where his testimony as

not only from evidence adduced by the State, but from the testimony of the defendants themselves, that, at the time of these conversations, the defendants were under the impression that they were in a place where they could talk freely, without danger of being overheard. There was absolutely no testimony that they were put in fear, or that they were under any kind of duress, which would have compelled them to talk, or that there was any inducement or hope held out to them. It is our opinion that the trial judge endeavored to comply with, and that he did enforce, the requirements as laid down in Corpus Juris, from which we have quoted, as to the admission of the "dictaphone testimony," and we do not think the exceptions pertaining to the introduction of this testimony possess merit.

After hearing the conversations of the defendants over the dictaphone, the defendant Jerry Hester was brought to the dining room, where the receiving part of the dictaphone had been located, and he was shown that part of the instrument, and there the receivers were placed over his ears and he was told to "listen in" on the conversation of his two sons, still in the cells upstairs, who were engaged in conversation with jailer Christopher. At the time it was alleged that the defendant Jerry Hester made certain statements to the officers, some of them concerning certain money which he had in his home, and other money which he had buried, the State claiming that this particular money was some of the money which was taken from Mr. Thackston, the deceased. The officers were permitted to testify as to the statements of Jerry Hester, made in the dining room, to all of which testimony the defendants objected, on the ground that the declarations at the time were not free and voluntary. The complaint is made here that such testimony on the part of the officers was incompetent, and resulted to the prejudice of the defendants. A careful reading of the record does not bear out, as we see it, the claim made by the appellants. The fact that the de-

fendant Jerry Hester may here have given testimony to the effect that his statements, made at the time, were not free and voluntary, was not in itself sufficient for the Circuit Court to have held that such was the case. There was testimony on the part of the officers that there was no force used by them; that there was no compulsion; but that all the statements made by the defendant were absolutely voluntary. In the case of the *State v. Danelly,* 116 S. C., 113; 107 S. E., 149; 14 A. L. R., 1420, heard by the Court *en banc,* in an opinion written by Mr. Justice Cothran, the Court quoted with approval the general rule as laid down in *State v. Rogers,* 99 S. C., 504; 83 S. E., 971:

"A confession is not admissible unless it is voluntary, and the question whether it is voluntary must be determined, in the first instance, by the Presiding Judge."

In the opinion it was stated, however, that it is not understood that the rule as stated in the Rogers Case was an absolutely inflexible rule.

The Court approved, in the Danelly Case, the following from 12 Cyc. 482:

"But at last this matter is left very much to the discretion of the Judge upon all the circumstances of the case."

"If there is a conflict of evidence, and the Court is not satisfied that the confession was voluntary, the confession may be submitted to the jury, under instructions to disregard it, if upon all the evidence they believe it was involuntary."

The course pursued by the Circuit Judge in this case was in accord wtih the principles announced in the Danelly Case. While he held that the proof was sufficient for him to admit the evidence of the declarations of the defendant, on the ground that they were free and voluntary, yet in his charge he left to the jury the question of determining finally if those declarations were free and voluntary. Under authority of the *State v. Danelly,* we are compelled to hold that the exceptions relating to this matter must be overruled.

For the benefit of the defendants Charlie and Claude Hester alone, error is charged on the part of the Circuit Judge in permitting, without comment or caution to the jury to disregard the same, certain answers of the witness Carlos A. Rector to certain questions propounded to him. The questions and the answers complained of are as follows:

"Q. When was it that Jerry Hester, as you stated a while ago, seemed to be very scared? A. He was very scared when he found out that we had heard the conversation over the dictaphone.

"Q. Had he ever seemed scared before? A. No, sir; he had been as hard as a steel post.

"Q. As hard as a steel post. How were the boys? A. They were tough enough."

In the record, which comes to us, it is shown that the questions set forth were put to the witness by one of the attorneys for the defendants on his cross-examination of the witness, and the answers of Sheriff Rector were in response to those questions. It does not appear that the attorney raised any objection that the answers were not responsive to his questions. There was no motion to strike out the answers, or either of them, and there was no request made of the Court to have the jury disregard the testimony brought out. Under these circumstances we are unable to discover any error even if the responses to the questions had been improper. Under the line of cross-examination to which the witness was being subjected, it is our opinion, though, that the answers did respond to the questions of counsel. For these reasons we think the exception made is not meritorious.

The following questions and answers appear in Sheriff Rector's testimony:

"Q. Did you leave Greenville and go to Mr. Jerry Hester's home looking for Thackston's money? A. I did.

"Q. And this is what you brought back? A. Yes, sir.

12—S. C. 137

"Q. Did you find any other money?   A. Yes.

"Q. Did you get that or leave it there?   A. The chest was unlocked, and there was $27.75, I am pretty sure, in another chest in the house that we left."

The appellants, in one of their exceptions, assert that there was error in permitting, "over objection," the questions stated and the answers thereto, on the ground that such testimony clearly indicated to the jury the opinion of the witness that he had secured money of the deceased from the possession of the accused, or from their home.

The "case" fails to substantiate the statement in the exception that objection was made to any of these questions, or to the answers of the witness to them.   We are not content, however, to raise in a case as serious as this the technical objection that the exception should not be considered, because counsel failed to object to the questions of the solicitor.   There had already been introduced evidence showing that the deceased was not only murdered, but robbed.   The witness had testified previously as to a conversation had with the defendant Jerry Hester as to money Hester had in his home, and money which had been buried by him, or under his direction.   Following the clue obtained, Sheriff Rector had gone to the Hester home in search of money.   Of course, his main purpose was to find money which it was believed Mr. Thackston had on his person at the time he came to his death.   Perhaps the solicitor should have simply asked a question as to the purpose of the sheriff's visit to the Hester home upon this particular occasion, letting the witness reply as to his purpose. The question propounded may have been leading, but it is often difficult in trial of cases for attorneys to keep from asking leading questions.   Our Court has repeatedly held that the examination of witnesses and the asking of leading questions is very much within the discretion of the Trial Judge.   In this instance the Judge was not called upon to make any ruling as to the questions asked.   Under all the

circumstances, we cannot hold that there was harmful error as alleged in the exception regarding the introduction of this testimony.

Further error is charged in that the Presiding Judge permitted the witness Carlos A. Rector to testify, after having been directed by Mrs. Daisy Hester, wife of the defendant, Jerry M. Hester, and after certain conversations had by the witness with Mrs. Hester, when no one of the defendants was present, that he found certain money. It is alleged that this testimony was entirely hearsay, and that the admission thereof was to the prejudice of the defendants. As stated previously, the officers testified that Jerry Hester gave them information as to certain money he had at his home and other money buried by him, or under his direction. This defendant, Jerry Hester, wrote his wife a note, at the direction of the officers, instructing his wife in the note to turn over certain money to the officers. With that note in his possession, Sheriff Rector went to the home of Jerry Hester, and exhibited the note to his wife. The result of the trip of the sheriff was that he found certain money in the possession of another Mrs. Hester. This last-mentioned Mrs. Hester, according to the testimony turned the money over to Mrs. Daisy Hester, wife of Jerry Hester, who in turn delivered it to Sheriff Rector. The witness, as many witnesses do, started in to relate some parts of the conversations he had with Mrs. Hester and his son, Cromo Hester. Not only did the Presiding Judge interfere to stop the witness from relating these conversations, but the record shows that the Solicitor himself cautioned the witness several times that he could not tell what Mrs. Hester and her son, Cromo, had said to him. When the Judge and the Solicitor stopped the witness in his statements, he readily yielded to their requests. The repeated rulings of the Judge, which were concurred in by the Solicitor, as to the incompetency of the testimony of the witness as to conversations with other per-

sons, when the defendants were not present, to our mind, sufficiently cautioned the jury to disregard such testimony. We realize the difficulties often confronting a Circuit Judge in his effort to keep witnesses from relating hearsay testimony. It is always hard to get witnesses, even when they are above the average in intelligence, to understand the rule against the admission of such testimony. It is our view that the repeated cautions of the Trial Judge in this cause were sufficient to overcome any hurt which may have been at first occasioned the defendants in the minds of the jurors, and the exceptions touching this matter are dismissed.

Sheriff Rector, and other officers with him, had a talk in the office of the sheriff, in the city of Greenville, with the defendant, Claude Hester, who had been placed under arrest; this conversation taking place after the arrest of Charlie, but prior to that of Jerry Hester. It appears that at that time Claude Hester denied any participation in the killing of Mr. Thackston, and claimed that he was at home throughout the whole of the night of the killing, and that he was asleep most of the time. According to the statement of the sheriff, Claude also stated that he did not know what Charlie and his father, Jerry had done. The record shows that Mr. Rector testified to the following questions asked by him of Claude Hester at the time, and the answers of that defendant thereto:

"Well, who do you think killed Mr. Thackston? He says, 'I don't know.' I says, 'Do you think Charlie and your father did it?' He said, 'I would not put it past them they are mean enough to do it.'"

There was objection to the testimony as to the statement of Claude Hester to Sheriff Rector. The witness stated that this statement of Claude Hester was afterwards repeated to Jerry Hester, in the presence of Claude Hester. It does not appear that Charlie Hester was ever informed as to the statement of his brother. The record does not show anything concerning the reply of Jerry Hester when the state-

ment was repeated to him, nor does it give any indication of the conduct of Jerry Hester at the time. We have before us only the statement that what Claude had said was at some time repeated to Jerry Hester. The introduction of that statement, through witness Rector, is made a ground of appeal.

We think the introduction of the testimony was error. At best, the statement of Claude Hester, as alleged to have been made, was only a matter of his opinion. In discussing with Sheriff Rector the killing of Mr. Thackston, his words were, "I would not put it past them." Again, according to Mr. Rector, Claude said, and the statement was allowed to remain in evidence, "They (Jerry and Charlie) are mean enough to do it." This assertion was a direct attack upon the character and reputation of the defendants, Jerry and Charlie Hester. It was an attack stronger, in our opinion, than any competent evidence as to their reputations, which could have possibly been introduced. It was the emphatically expressed opinion of the son of one of the defendants, and a brother of another, that these two defendants were mean enough to have committed a most horrible crime.

The defendants did not put their characters in issue. Had they done so in a proper manner, this testimony would still have been incompetent, for the State could not have replied to testimony of good character offered by the defendants with testimony like that of the declaration which came to the Court from Claude Hester. Claude himself could not have so testified. The fact that the words of his son had been later repeated by Sheriff Rector to Jerry Hester does not, in our opinion, make the testimony competent, for at least one reason, that there is no accompanying evidence showing that Jerry Hester heard the statement or that he acquiesced therein, and there was no testimony showing his conduct at the time.

For another reason, we regard the admission of this statement of Claude Hester as erroneous. The words alleged to have been used by Claude Hester

appears to us as being in the nature of a statement attempt-
ing to inculpate his co-defendants and excuse himself. In
the case of *State v. Mitchell,* 49 S. C., 410; 27 S. E., 424,
in a unanimous opinion of this Court, written by the late
distinguished Chief Justice McIver, it was definitely de-
cided that any statement of one defendant, even when jointly
indicted with others, which attempts to inculpate his co-de-
fendant and excuse himself is not admissible. The exception
pertaining to the introduction of this testimony must be
sustained.

In his cross-examination of the defendant Jerry
Hester, the Solicitor inquired of him concerning his
habits of intemperance prior to, and about the time
of, the commission of the crime charged against him. It
is contended that thereby the right and privilege of cross-
examination was abused and that the conduct of the solici-
tor in asking questions along the line of those which were
asked by him of the witness was highly prejudicial to the
accused, and error is alleged on this account. The defend-
ant Jerry Hester, on his direct examination, had said that
he was sick, and confined to his home at the time of the
homicide. In this statement he was supported, to some ex-
tent, by other evidence. It is apparent that by his cross-
examination the solicitor was endeavoring to discredit the
claim of Hester that he was ill, and especially that he had
been sick to any extent or for any length of time, but that
any indisposition which the defendant may have had was
due to his use of intoxicating liquors. We do not think this
line of cross-examination was improper, and we find no
merit in the exception regarding it.

Another exception concerning the conduct of the solicitor ·
relates to his cross-examination of the defendant Charlie
Hester as to "a supposed visit" on the part of that defend-
ant to "some woman in jail" in the city of Spartanburg on
a day soon after the death of Mr. Thackston. The main
thing which appears to us that the solicitor was making in-

quiry about was if the defendant had given money to some woman shortly after the robbing and killing of Mr. Thackston. Not caring to express our opinion as to the facts of the case, we do not given all of our reasons why this cross-examination, under the circumstances, was proper; but the complaint of error in that regard is dismissed.

J. C. Floyd, who was also arrested for participation in the murder of Mr. Thackston, and who was afterwards sentenced on a conviction of manslaughter for his part in the homicide, had several conversations with the officers who were endeavoring to discover the parties guilty of the murder of Mr. Thackston. Finally a lengthly written statement, which was written by State Constable Rogers, was signed by Floyd, and sworn to before Mr. Rogers as a Notary Public. This affidavit gave Floyd's account, not only of his own acts, conduct and words in connection with the crime charged against him, but also set forth many things stated by him to have been done by the defendants in this case, and the words spoken by them from time to time. This affidavit should be incorporated in the report of the case.

After obtaining the affidavit from Floyd, one of the officers read the same at one time to the defendant Jerry Hester, and at another time to the defendant Charlie Hester. At the time of the reading of the affidavit to Jerry Hester, and also at the reading thereof to Charlie Hester, each of these defendants was in the custody of the sheriff, and no one was present except the defendant and the officers. After the reading of the affidavit to each of the two defendants named, the officers carried Floyd into the presence of each of them, and it was stated in the testimony that Floyd went over, in his own language, to both Jerry Hester and Charlie Hester, but at different times, practically and substantially all that was contained in his affidavit.

The record shows, according to the testimony of one of the witnesses for the state, Mr. Rogers, that the conduct

and words of the defendant, Jerry Hester, following the reading of the Floyd affidavit to him, were as follows:

"He never opened his mouth, only hung his head. He sat there for approximately 5 or 8 minutes. I says, 'Well, you have got nothing to say?' He hesitated again, casually throwed his hands, and says, 'I will tell my tale when I get in Court.' I says, 'Cap'n Jerry, don't you believe that that statement was made?' I says, 'It is sometimes hard to convince. Do you know that we have got Floyd arrested?' He said, 'I don't know whether you have or not.' I says, 'We would like to come fair and square with you if you doubt it. If you doubt that that's Floyd's statement, I will send to the jail and bring Floyd up here.' I was some time in the morning, about 3 o'clock, he says, 'Well, I wish you would send for him.' "

After Floyd was ushered into the presence of Jerry Hester, according to the same witness, Rogers, the following occured, as stated by the witness:

"I told him, 'Now, Capt. Jerry, here is Floyd. I have read you his statement. Any questions you want to ask him about it?' At first he said, 'No.' Mr. Floyd got to talking with him then, and practically repeated the whole thing to Jerry"

The witness was asked: "What was his manner as Floyd came in?" He answered: "Just kinder wilted down, and he never disputed it with Floyd."

The witness further testified that Floyd practically went over the statement to Jerry Hester, and told that defendant that he (that defendant) knew that everything he (Floyd) had said was true, and that Jerry Hester made no denial. The witness was asked, "What was his manner?" The reply was:

"Just sitting there with his head hanging down. Don't think he looked at him much."

The witness, Rogers, further related that early the following morning, in the presence of Sheriff Rector and De-

tective Williams, he had Floyd to talk to the defendant, Charlie Hester, who was at that time in the custody of the officers. He stated that he read the statement of Floyd to Charlie Hester, "And he (Charlie) never opened his mouth." At the suggestion of the witness, Floyd had been sent for. As testified to by Detective Rogers, "Floyd went over the whole thing, and Floyd made the statement to him (Charlie Hester) about meeting him as he and his brother, Cromo, was going out." The witness said that Charlie Hester asked Floyd: "Are you sure you met me?" And that Floyd answered: "You know that I met you."

Detective Rogers testified that Floyd "accused him of it just exactly what it is in that statement, and Charlie sat there."

Detective Rogers also testified that—

"Sheriff Rector finally stepped over and touched Charlie, and said, 'Look here, boy, are you going to lay there and let a man accuse you of murder and send you to the electric chair, and you never resent it or never say a blessed word,' and in a few minutes Charlie looked at Floyd and said, 'You are a liar,' and with that Floyd said, 'Charlie, this is the first time a man ever called me a liar in my life, and, if these gentlemen will let me, I will settle it right here. You know I am telling the truth.' "

Questioned by the Solicitor, the witness stated that Charlie made no reply to the last statement alleged to have been made by Floyd.

The testimony of Detective Rogers as to the securing of the affidavit from Floyd and the reading of it to Jerry Hester and Charlie Hester, and as to the conversation passing between Jerry Hester and Charlie Hester, respectively, with Floyd, was corroborated in the main details by Sheriff Rector and Detective Williams. We find nothing in the record showing that the purported affidavit of Floyd was ever read to the defendant, Claude Hester, or that he was

at any time prior to the trial of the case advised of the contents. of that paper.

The evidence for the State, as brought out by the officers, was to the effect that the affidavit of Floyd was made by him freely and voluntarily. The officers also testified that at no time were either of the defendants in such situation as prevented him from acting freely and voluntarily. But on cross-examination of State Constable Rogers, when inquiry was made "if the officers had not threatened to keep Charlie Hester in confinement for 24 hours, without food or drink, if he did not confess," Mr. Rogers answered:

"I heard something about keeping him there, questioning him for 24 hours, but there wasn't anything said without food or drink."

Pressed further, Mr. Rogers stated:

"Sheriff Rector says, 'I am going to get you to tell me the truth if I have to stay here 24 hours.'"

The attorneys for the defendants made vigorous and repeated objections on many grounds to the testimony of the officers as to the reading of the Floyd affidavit to Jerry and Charlie Hester, to the testimony of the statement of Floyd to each of these two defendants, and the evidence as to the words and conduct of Jerry and Charlie Hester upon the respective occasions referred to. The defendants especially protested to the Court against the reading to the jury by witness Rogers of the Floyd affidavit. All of their objections were overruled, and the record shows the view of the Circuit Judge as to the reasons for the admission of the testimony and the reading of the affidavit as follows:

"Court: Well, that's true. What Floyd said in that case would not bind the Hesters. It depends upon what Hester said about it.

"Solicitor: Certainly. Hester's reaction to the charge.

"Court: Yes, sir; and, if he was charged with it, and said nothing, whatever he said might. be used against him, and,

as I take it, this statement here will be charging him with
murder.

"Solicitor: Yes, sir.

"Court: And not only a direct charge of murder, but
probably the details, I don't know.

"Solicitor: Yes, sir; that's right.

"Court: I think it would be admissible *just as much so if
Floyd were confronting him in making this statement to
him.*" (Italics added.)

Numerous exceptions of the appellants relate to the in-
troduction of this testimony and the reading of the Floyd
affidavit.

Many of the exceptions also complain of error in the
charge of the trial Judge, in which he explained to the jury
his views of the law touching implied confessions and the
duty of an accused person to speak under certain situations.
In view of this, we think we can reduce the length of this
opinion, which is necessarily long, by considering the charge
of his Honor along the lines indicated at the same time that
we pass upon the exceptions relating to the testimony, about
which we are now inquiring. The reporter should incor-
porate in the report the part of the charge of the Judge to
which we refer, beginning at the first line of folio 1171,
and ending on the last line of folio 1183 of the "case."

While the Judge did not give the title of the case in our
reports to which he referred in his charge, it seems to be
agreed by both the appellants and the respondent that he
had reference to the *State v. Sudduth,* 74 S. C., 498; 54
S. E., 1013. An examination of the case indicates that
some of the language of the charge was quoted therefrom.

In the case of the *State v. Sudduth, supra,* two officers,
Sudduth and Putnam, were charged with the killing of one
Sloan while attempting to arrest the deceased for a misde-
meanor. A physician, Dr. Bramlett, went to attend Sloan,
who was lying between the dwelling part of the jail and the
cell doors. Dr. Bramlett testified that Sudduth and Putnam

were there, and he thought they were near enough to hear what was said; that, in reply to a question asked by him, Sloan said he was shot; that Sloan turned to Sudduth and said, "You will have to die some day and give an account of this"; and that Sudduth made no reply. The defendant, Sudduth, on his appeal to this Court, questioned the admission of the testimony of Dr. Bramlett. It was held there was no error, and the Court cited as authority 1 Greenleaf, 197. In the opinion, the principle laid down in the case was distinguished from the determinations formerly announced in the cases of *State v. Edwards,* 13 S. C., 30, and *State v. Senn,* 32 S. C., 392; 11 S. E., 292.

In the *Edwards case,* the board principle was announced that, if a party hears a criminal charge against him, made in his presence, and says nothing, it is not an admission on his part, and in the eyes of the law the party does not accept the charge made as his confession. In that case the Circuit Judge had charged to the contrary. There was a reversal, and in that case the Court said this:

"The effect of the charge was to give the silence of the parties the legal force and effect of confession of guilt. It must, in this respect, be distinguished from the proposition that the conduct of parties under accusation of crime may be given to the jury, as circumstances to be weighed in connection with the question of guilt or innocence. To give the silence of parties such legal effect, is equivalent to holding that every person, accused of crime by any person regardless of time, place, or circumstances, is bound to deny such accusation and affirm his innocence. It is clear that the law imposes no such obligation on a party accused; but, on the contrary, it is his right to stand mute, and the burden of showing the guilt is on those that make the accusation."

The *Sudduth case* was referred to in *State v. Goodwin,* 127 S. C., 107; 120 S. E., 496, and the principles thereof were there applied. In the *Goodwin case,* a statement was

made by the stepdaughter of the deceased, in the presence of the defendant and an officer, who had the defendant under arrest for a misdemeanor not connected with the homicide, which, according to the testimony of the woman, was as follows:

"Take the dirty rascal out of my house, and kill him and burn him! * * * He has killed my poor old father. Take him out!"

The evidence was to the effect that the defendant made no denial or any reply whatever to the woman's words, which were addressed not to him, but to the officer. The officer testified that when he caught what she had said he knew that there was trouble, and carried the defendant out. While applying the rule of the *Sudduth case,* the Court, in an opinion written by Mr. Justice Cothran, held that the admission of the tesimony was prejudicial error. Reviewing the question, Mr. Justice Cothran used this language:

"Was the remark addressed to the defendant? Was he aware of his right to reply to it or the consequences of his not doing so? Did he have an opportunity to reply? Was he overwhelmed by fear, distress, or the belief that nothing he could say would avail? Under the shrieking charge of a frenzied woman, was he under a duty, not suspected or charged with the crime at the time, to answer her execration? Was he expected to do so by her, the officers, or any one present? We do not think the circumstances warranted the admission of the testimony under the rule announced by Greenleaf and quoted in the *Sudduth case.*"

Since there has not been, so far as we are aware, any case which overrules, varies, or modifies the holding in the *Sudduth case,* we feel constrained to follow the principles laid down there by this Court. At the same time we are of the positive opinion that it would be dangerous to extend the principle of that case the least bit, for there this Court gave its sanction to the statement of Mr. Greenleaf that—

"*Nothing can be more dangerous than this kind of evidence. It should always be received with caution; and never ought to be received at all, unless the evidence is of direct declarations of that kind which naturally calls for contradiction; some assertion made to the party with respect to his right, which by his silence, he acqiesces in.*'   (Italics added.)

Prior to the decision in the *Sudduth case,* some phases of the question determined in that case seem to have also been considered in a few other cases.   In *State v. Major,* 70 S. C., 387; 50 S. E., 13, Mr. Justice Jones, who wrote the opinion of the Court, cited the case of *State v. Edwards, supra,* as authority for sustaining the admission of testimony as to the conduct of the defendant, and, in the conclusion, of his opinion this distinguished Judge used these words

"While silence under accusation of crime cannot have the legal effect of the confession of guilt, it is nevertheless a circumstance to go to a jury on a question of his guilt or innocence."

In that case, however, it does not appear that the accused was under arrest at the time, but that the language, which it was claimed he used, was spoken to his wife, who seems to have been the prosecutrix.

A case of some interest is that of *State v. Carroll,* 30 S. C., 85; 8 S. E., 433; 14 Am. St. Rep., 883.   The defendant was charged with adultery.   Prior to his arrest. or even indictment, a number of the citizens of the town of St. Matthews, where the defendant resided, held a meeting, and passed certain resolutions touching the alleged conduct of the defendant, and these resolutions were communicated to him, to which he replied by letter, and therein he pledged himself to abandon at once and forever all connections with his alleged paramour.   The resolutions of the citizens and the reply of the defendant thereto were introduced in evidence.   Also the evidence showed that the defendant had made to his brother-in-law the same admis-

sions contained in his reply to the resolutions of the citizens. This Court sustained the introduction of both the defendant's reply and the resolutions, but Associate Justice McIver, speaking for the Court, in giving the reasons therefor, said this:

"The question then recurs whether the letter was extorted from appellant by duress. The Circuit Judge has found that it was not, and we think the testimony fully sustains his finding. *The appellant was not under arrest at the time, and none was then threatened. The parties to whom the communication was made were not shown to be officers of the law.*" (Italics added.)

In the *State v. Senn*, 32 S. C., 392; 11 S. E., 292, where the defendant was tired for the murder of his wife, it appeared that at the Coroner's inquisition, held over the dead body of the deceased, before the defendant was charged with the crime, he testified as a witness. In the trial, his statements made at the inquest were introduced in evidence by the State, but a majority of this Court held that this was error, and this holding has been affirmed repeatedly

It appears then that, while this Court has, in a number of instances, given its approval to the introduction of testimony going to establish the fact of the silence of the accused when he was directly charged with the crime in his presence, and that it has sustained the introduction of testimony as to the conduct of the accused under such circumstances, still it appears to us that this Court has not looked with great favor upon the receipt of testimony of this character when the accused was under arrest.

We have found many cases from jurisdictions other than our own concerning admission of testimony of this character, and there has been a great contrariety of views touching the same. The tendency of a majority of the Appellate Courts seems to have been against the allowance of such testimony. In our examination, we have found one case almost on all fours with this case as to the particular tes-

timony under consideration; the difference, if any, being
that in the case to which we refer the accused was not
surrounded by as many disadvantages, perhaps, as we think
may have been about the defendants in the case at bar. We
refer to the leading case of *O'Hearn v. State,* 79 Neb.,
513; 113 N. W., 130; 25 L. R. A. (N. S.), 542. A brief
review of the applicable facts of that case are these:
O'Hearn with others, namely, Nelson, Warren, and Angus,
were charged with murder. "On the day after the crime,
Angus, Warren, and Nelson, being under arrest, were ques-
tioned by the police officers, and their separate statements
taken down by a stenographer, reduced to longhand, and
after being read over to each of them were by each respec-
tively subscribed." It seems that the statements of Warren
and Nelson amounted to little, but that of Angus was of
particular importance as bearing on the guilt of O'Hearn.
"About ten or twelve days afterwards the accused four
were taken by the police officers to a small room in the city
jail, and there the statement was read over to Angus in
O'Hearn's presence, and Angus, upon being questioned, said
that it was his voluntary statement, and that he signed the
same. O'Hearn was asked by a police captain if he wanted
to make any statement in regard to it. He said he did not.
He would make his statement at the proper time, or that he
would stand trial and tell his story then, as the witnesses
variously testify. * * * The defendant had been taken to
this room for the purpose of procuring an admission from
him. By his conduct and words he neither assented to nor
denied the truth of the statement read, but indicated his
purpose to make his own statement and tell his own story
at the proper time."

At the trial of the case against O'Hearn, the statements
of Angus and Warren were offered in evidence by the State,
and, although the defendant, O'Hearn, objected, the trial
Court admitted the testimony.

The Supreme Court of Nebraska, in an able opinion, re-

versing the case on the ground that the admission of this testimony was error, amongst the things stated in the opinion, said:

"Under such circumstances, taking into consideration the fact that the defendant was under arrest, that it was sought by the officers in whose custody he was to elicit a statement from him as to the facts of the crime to be used against him, surrounded by hostile influences, and with the fear that what he might say might be misconstrued, or used to his injury, the fact that the defendant reserved his statement until some future time is far from giving countenance to the idea that he thereby assented to the statement which had been read in his hearing. So far from giving color to the idea of assent, it rather conveys to an unprejudiced mind the idea of dissent and the intention to tell the true facts himself. Perhaps the weight of authority in this country is with those Courts which hold that the mere fact of arrest is sufficient to render a statement made in the presence of the prisoner, to which he makes no reply, incompetent evidence, for the reason that no assent can be presumed under such circumstances, and that the very surroundings of the accused in such case are such as to render it entirely proper and natural for him to keep silent in the fear of misquotation or misconstruction. A person in such a situation would naturally fear that the worst possible interpretation would be placed upon his language; that the memories of those present would lean to statements prejudicial to his interest, and that an officer seeking to convict might supply through zeal any defect in the statement which was actually made. * * *

"It may further be said that, if such a practice were permitted as the introduction in the evidence of a written statement of this kind as original evidence where the person making the statement is within reach and can be produced, it would deprive the defendant of one of the most valuable rights granted to him by the Constitution, namely, the right

13—S. C. 137

'to meet the witness against him face to face." It takes
away from him the keen scalpel of cross-examination, the
power to dissect and lay bare the truth, it may be, from
amid a mass of falsehood. If an unscrupulous wretch
should make a false statement in writing, and if the ac-
cused thought it necessary or advisable to refrain from
denying it while under arrest, if this practice were tolerated,
his defense would be made more difficult, and false swearers
might find an easy method of perjuring themselves."

As in the *O'Hearn case,* the accused in this case, Jerry
and Charlie Hester, were under arrest, the officers were, un-
doubtedly, seeking to elicit a statement from them as to the
facts of the crime, to be used against them, and it must
be apparent that they were surrounded by hostile influ-
ences. OHearn stated "he would make his statement at the
proper time." The accused, Jerry Hester, stated, "I will
tell my tale when I get in Court." At the insistence of the
officers that Charlie Hester make some statement he de-
nounced his accuser as a falsifier.

Deeming it proper, however, that we should look more
to our own adjudicated cases for authority, when possible,
than to the cases from other jurisdictions, however strong
may be the personnel of the Court, and however logical
and just may be the reasoning of their opinions, we feel
that we should compare the circumstances surrounding the
accused in this case with those about the accused in our
own case, that of the *State v. Sudduth.* As we read the
report of the last-mentioned case, the person there accused
of crime was an officer of the law. The accusation was
made by the injured man, who was then suffering and
dying from a wound given him by the accused. The ac-
cused had the benefit of the presence of his brother officer,
who was his co-defendant, evidently his friend, and two
other persons, the jailer and a physician, to all appearances
entirely disinterested men. There was little likelihood that
what the accused may have said would have been miscon-

strued or misquoted. The statement made by the accuser there was a direct and positive declaration, under the view of the Court, of the charge of crime, but there was no long recounting of evidentiary details. There was at no time any denial or any kind of response on the part of the accused. There was no continued and persistent effort on the part of any one to secure from Sudduth some statement, with the expectation of using that statement against him on his trial. Here it cannot be doubted that the officers were for days and days seeking to elicit from the accused not only information which would aid them in discovering the parties guilty of the crime, which they were investigating, but they were especially desirous of getting from the accused remarks which they could use as evidence to bring about their conviction.

We have no intention of criticizing the conduct of the officers, and in many respects they are to be commended for their zeal and persistence in attempting to ferret out those who are guilty of the cruel murder of Mr. Thackston. It may be unfortunate, and often perhaps it is not justified, but it cannot be disputed, that many people, and even persons who are entirely innocent of wrongdoing, are afraid to talk in the presence of detectives. We must not forget, too, that from time immemorial it has generally been conceded an unwise thing for those charged with criminal offenses to talk to anybody and everybody about their cases, and especially to engage in conversation with those who may not be friendly to them. For years and years the members of the bar have cautioned their clients not to discuss their cases with those with whom they came in contact, unless absolutely assured of their friendship, and many good lawyers have advised clients to refrain from talking at all. This has been the practice so long that it has become a well-known fact to our people generally.

The admission of the testimony of the officers as to the conduct of the accused upon the respective occasions of the

reading of the Floyd affidavit to them, and at the time of the statements of Floyd to the accused of the contents of his affidavits, is not only a direct conflict with the principles as announced in the *O'Hearn case, supra,* but, to our mind, this testimony does not come within the rule as announced in the *Sudduth case.*

We regard also serious error the reading to the jury of the Floyd affidavit. The fact that what Floyd had stated, and subscribed to, was given by him under oath to a notary public does not mend the matter; to the contrary, it may tend to aggravate it. Rules of evidence are necessary in the conduct of our Courts. But no rule of evidence made by any Court, or by any legislative power, or announced by any distinguished author, can have the effect of nullifying a guaranty given our people in the Constitution of the State. In our Constitution, adopted by our people in 1895, in the very first Article, which is a declaration of the rights of the people, there is contained the following language:

"In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury; and to be fully informed of the nature and cause of the accusation; *to be confronted with the witnesses against him* [italics added]; to have compulsory process for obtaining witnesses in his favor, and to be fully heard in his defense by himself or by his counsel or both." Article 1, § 18. Constitution.

The right "to be confronted with the witnesses against him" is just as great as that a person shall have the right of "public trial by an impartial jury," or that he "be fully informed of the nature and cause of the accusation," or that he shall "have compulsory process for obtaining witnesses in his favor," or the right "to be fully heard in his defense by himself or by his counsel, or both." Mr. Chief Justice McIver, in *State v. McNinch,* 12 S. C., 89, used these words:

"But the right to cross-examine is one which must remain inviolate. To take it away would render almost valueless the constitutional right 'to meet the witnesses against him face to face.' * * * 'The power of cross-examination has been justly said to be one of the principal, as it certainly is one of the most efficacious, tests which the law has devised for the discovery of truth.' * * * One of the most inestimable rights by which a man may maintain his defense."

Mr. Associate Justice Watts, in discussing the provision of our Constitution, to which we have referred, has said this:

"This constitutional provision is generally held to require the personal presence of the witness so that the accused may be enabled to cross-examine him." *State v. Bigham,* 133 S. C., 491; 131 S. E., 603.

The Constitution of the United States (Amend. 6) also gives to the accused the right "to be confronted with the witnesses against him." And the Supreme Court of the United States, passing upon the meaning of that provision, has made this forcible declaration:

"The object of this provision was to prevent the use of affidavits or *ex parte* depositions against a prisoner in lieu of a personal examination of the witness in the presence of the prisoner and subject to his right of cross-examination." *Mattox v. United States,* 156 U. S., 242; 15 S. Ct., 337; 39 L. Ed., 409.

Under the law of this State, unless a defendant in a criminal cause consents thereto, the testimony of a witness against him, taken by affidavit, cannot be used in the trial, even if the witness is sick or dead or beyond the jurisdiction of the Court. Under our law, too, if the Solicitor should give notice to the attorney for the defendant that he expected to take the evidence of a State's witness by deposition, and invited defendant's counsel to appear and cross-examine the witness, the testimony so taken could not

be used against the defendant in his trial, unless the defendant freely consented to allow this to be done.

To sanction the reading of the Floyd affidavit to the jury in this case would, in our opinion, not only violate the rules of our Courts as to not allowing the introduction of *ex parte* affidavits, but would be in direct conflict with the guaranty to the accused as given him by the Constitution of South Carolina.

If this Court should approve the method, permitted and followed in the allowing of introduction of the evidence of Floyd, contained in his affidavit, it might virtually mean in many instances hereafter that a defendant in the Courts of this State could be tried with but one witness appearing against him, although there might really be a large number of witnesses of importance necessary to make out the case of the State, and the only witness so appearing might know absolutely nothing as to any material fact in the cause; and incompetent testimony, such as hearsay, opinion, and rumors, might get to the ears of the jurors. A detective, officer, or some person, who happened to be a notary public, could get from all the witnesses against the defendant affidavits setting forth what they might know, or claim to know, against the defendant. These could be carried to the county jail, where the defendant is incarcerated, and read to him. The defendant, exercising his rights to refuse to discuss his case, might say nothing in reply, or might make statements by way of denial or explanation of the contents of the affidavits against him, or might "hang his head down." The person who had read the affidavits to the defendant could go into Court, have himself sworn as a witness, and read the affidavits to the jury, together with his statement as to the conduct of the defendant at the reading. The result would be that the defendant would be deprived of his right to cross-examination, the jury would not have the privilege of seeing the witnesses, so that they might pass upon their credibility, and a trial in our Courts

would be far from being "fair and impartial." And even this might occur: One disqualified under the law from giving testimony in a Court of justice could make his affidavit, or written statement, against an accused, and, through the medium of having this read to the accused, succeed in placing his testimony before the jury, when, because of his disqualification, he could not there appear in his own person. We fear, if we should lay down as a precedent the right to introduce, as original testimony, affidavits like that of the Floyd affidavit, that the innocent as well as the guilty, in years to come, might be denied the great privilege of cross-examination of witnesses against them, a right which has come down to us from our forefathers as a thing of sacredness to the liberties of our people; and a right which has proved, in so many instances, the shield of the innocent against the testimony of perjurors.

All the exceptions relating to the admission of the testimony as to the reading of the affidavit of J. C. Floyd to Jerry Hester and Charlie Hester, and the matters occurring at the reading of the affidavit to those defendants, and as to the statements of Floyd to the defendants as to the contents of his affidavit, and the introduction of the affidavit in evidence, must be sustained.

Now let us consider the exceptions of the appellants to the parts of the charge of the presiding Judge, which referred to the testimony which we have decided was incompetent, and those parts of the charge relating to confessions and implied confessions.

It has been held by this Court that it was not improper for a Circuit Judge to use cases, decided by this Court, for the purpose of illustrating to the jury principles of law applicable to the case on trial, and that a trial Judge is even permitted to read from adjudicated cases the principles of the law announced by this Court, when such principles are applicable to the case being tried. *Sumter Trust Co. v. Holman,* 134 S. C., 412; 132 S. E.,

811, and cases there cited. This, of course, does not mean that a trial Judge should use the facts of our reported cases as an illustration in his charge, for a prosecution for crime should be established on its own particular facts, and a slight variance in the facts might mislead the jury. (*State v. Tapp,* 105 S. C., 55; 89 S. E., 394.) And the right of the Judge to read from adjudicated cases, in order to make clear to the jury principles of law which he wishes them to be informed of, does not mean that he should, in any way, invade the province of the jury to pass upon the facts of the cause, without the participation of the Judge therein.

In reading from reports of cases decided by this Court, the trial Judge should always be careful not to read, from such cases, matter that might give an indication of his own opinion, or what the opinion of this Court might be, as to the facts pertaining to the case on trial. Often it is necessary for this Court to apply facts in a given case to the legal questions involved therein. Also it is sometimes necessary for this Court, in announcing legal principles, to lead up to such announcement by the saying things, or putting forth argumentative language, much of which should not be considered as being embodied in the legal principles declared.

In charging the jury in this case, the Circuit Judge did not go into the facts of the *Sudduth case.* In reading from that case, therefore, there was no error, unless in the reading some matter was given to the jury which it was not proper to be read to them, or in the reading thereof there was some invasion by his Honor of the right of the jury to pass upon the facts of the cause without participation on the part of the trial Judge.

In the *Sudduth case,* while the evidence as to the silence of the accused under the accusation made against him, in his presence, was admitted in the testimony, the report does not show that this Court passed upon any language of the Circuit Judge in his charge to the jury pertaining to the admission of that testimony. We cannot, therefore,

hold that case as authority as to what should be said, or should not be said, by a trial Judge, as to confessions and implied confessions. All that was stated by this Court in the *Sudduth case* on the subject of implied confessions related to the competency of the testimony. A reference to the charge of his Honor will show that he read much from the opinion in the *Sudduth case* given by Mr. Justice Woods as the reasons for the Court's conclusion that there was no error in the admission of the testimony.

In the *Goodwin case, supra,* Mr. Justice Cothran, who wrote the opinion for the Court, had this to say:

"The admission of such evidence [silence under accusation of crime] is strongly assimilated to the admission of a confession; in fact, it is sometimes spoken of as an implied confession. When a confession is offered as voluntary, the question of whether or not it is voluntary must be determined, in the first instance, by the presiding Judge. *State v. Danelly,* 166 S. C., 113; 107 S. E., 149; 14 A. L. R., 1420, and cases cited. If there should be a conflict of evidence upon this question and the presiding Judge is not satisfied that the confession was voluntary, he may submit the issue to the jury under instructions to disregard it if they find that it was not voluntary."

While the writer has the impression that, even if the trial Judge determines that evidence as to a confession, or implied confession, should be admitted, after all, the final determination as to its being free and voluntary is a question for the jury. Still, under the *Goodwin case,* if it is discretionary with the Judge to submit, or not to submit, the issue to the jury, it would seem that even then, where the issue is submitted, that such issue, and all the surrounding circumstances, should be left to the jury for determination without any expression of opinion from the Judge as to his views regarding the evidence or his reasons for admitting the same. We think that, where the issue is submitted, there should be no participation on the part of the Court in

settlement of questions of fact, but these should be left entirely to the jury for settlement.

In the *Goodwin case,* the charge of Hon. Robert E. Lide, Special Judge, concerning confessions and implied confessions, which will be found in the report of the case, was commended as a clear exposition of the law, relative to such matters. In the statements of the law there given there was absolutely no indication of the Judge as to his opinion, one way or the other, as to the force or effect of the testimony of the implied confession there charged against the defendant. We fear that in the case at bar the distinguished Judge used, inadvertently, of course, in several instances, language which unduly conveyed to the jury his opinion of matters which should have been determined by the jury alone at that stage of the trial, and, certainly, that the expressions of the Judge were such as gave inferences to the jury of his views as to the evidence adduced. And in these instances, too, we think there was legal error committed.

We call attention to some of the expressions. It was stated by the Judge:

"If he is charged with crime, the law says he cannot stand up, and keep his mouth shut, but it must be under such circumstances that it would be his duty to speak and deny the charge."

As pointed out heretofore in the *Sudduth case,* Mr. Justice Woods distinguished between the holding there and the conclusion reached in *State v. Edwards, supra.* In both these cases, while it was held that, under certain circumstances, the failure of a party accused of crime to make denial thereof when an accusation was made against him in his presence could be offered in evidence as a circumstance against him, still we do not conceive that it has ever been held in this State that an accused person is required at any time to speak. To the contrary, the positive declaration was made in the *Edwards case* that the accused had the "right to stand mute." The words used by the trial Judge, "if

he is charged with crime, the law says he cannot stand up, and keep his mouth shut," as well as the expression later used, "and again he might be in such a situation that the law says you must deny it if you are not guilty," were, in our opinion, in direct conflict with the principle announced in the *Edwards case*.

The trial Judge also used the following language to the jury:

"Some ignorant person, some ignorant negro, in the presence of five or six officers, may be charged with a crime, and it may be that, not knowing his rights, not knowing that he is expected to say anything, he might stand silent."

The defendants are white men. The evidence as to their remaining silent, under accusation, showed that this conduct occurred in the presence of not more than three officers. When the statement just quoted was made, it may be that the jury were impressed with the idea that, while a negro, in the presence of five or six officers, might stand silent, a white man, in the presence of only three officers should speak.

We think, too, that all through the charge there were repeated expressions on the part of the Judge which unduly conveyed to the jury his idea that the evidence which had been received should have been admitted by him, and that the jury should pay especial attention to that particular testimony. Some of the declarations to the jury by the Judge, especially those we have italicized, which we are afraid may have had, unintentionally, this effect, were these:

"Nothing, it is said, can be more dangerous than this kind of evidence. It should always be received with caution, and never ought to be received at all, unless the evidence is of direct declarations of that kind which naturally calls for contradiction."

*"In my judgment, I allowed the evidence to come in; sufficient for me to submit it to you.* Was he overwhelmed

by fear or distress or the belief that nothing he could say would avail? These and perhaps other matters it may be necessary for the Circuit Judge to consider before allowing the testimony to go to the jury as worthy of any consideration."

"In some of these matters submitted to you, and which I allowed to go before you, there was a question as to whether or not the evidence should come in. *Well, in my judgment, I thought it should come in.*"

"That was a question primarily for me to pass on, for the Court to pass on, but, there being in some instances evidence on both sides of that question, why I am going to submit it to you."

"Was any confessions and statements made free and voluntary? *Whatever they were, if they were against the defendant, they can be used against him in Court, and you are to take them into consideration.*"

"Does his silence mean anything? *This is a question of fact to be decided by the Circuit Judge, and his conclusions will not be disturbed by this Court (referring to the Supreme Court), unless without reasonable support.* Was the accused aware that he had a right to speak? Now, this was passed on first by me, gentlemen, in submitting the case to you, and now I am going to submit the matter to you."

We do not see how the jury could help from being impressed with the idea that the presiding Judge thought that the accused should not have remained silent when the officers read to them the affidavit of Floyd, and when Floyd stated to the accused the contents of his affidavits; and, under the circumstances we think the quoted expressions make reversible error.

Mr. J. D. Childress was a witness for the State. In 24–26 substance, he testified that on the night in which Mr. Thackston was killed he went to the store of the deceased, and that while he was there he heard a noise which apparently was some person or other walking up the steps

of Mr. Thackston's store, and that he did not hear anybody afterwards walk down the steps; that no one came into the store, although Mr. Thackston called once or twice, "come in." There was objection to this testimony on the part of the defendants on the ground that any conversation between the witness and the deceased was incompetent. The Solicitor contended that this testimony was perhaps a part of the *res gestæ.* Appellant claim that there was error in admitting this testimony. It is true, as a rule, that testimony as to a conversation between a deceased person and a third party, when the accused is not present, is inadmissible, unless the same can be brought within the rule of *res gestæ* testimony. *State v. Bigham,* 133 S. C., 491; 131 S. E., 603. It did not appear in the testimony exactly what time Mr. Thackston was killed. Time, of course, is an important element in testimony, admissible under the *res gestæ* theory. The admission of testimony of this class is very much in the discretion of the presiding Judge. The theory of the State was that Mr. Thackston was killed within a few minutes after he left his store. Under the other testimony admitted in the case, as circumstances against the defendants, we cannot hold that the testimony of the witness was irrelevant. Certainly his testimony as to the noises which he heard was competent.

Three witnesses for the State, Childress, Mrs. Thackston, the wife of the deceased, and his brother, King Thackston, over the objection of the defendants, gave testimony as to the habit or custom of the deceased upon closing his store at night of putting his money into shot sacks tied with shoe strings, placing the sacks of money in his grip, or hand bag, and carrying the grip or hand bag, sacks, and money to his home. Mr. Childress testified that on the night of the killing Mr. Thackston, upon leaving the store, put money into the grip, and that he saw some shot sacks at the time. Mr. King Thackston testified the hand bag was found near the dead body of his brother.

There was some evidence on the part of the State that shot sacks, similar to those used by Mr. Thackston, were found in the home of the defendants. The appellants urged that the testimony as to the habit or custom of the deceased should have not been presented. The Solicitor contended that it was admissible as a part of the *res gestæ.*

Mr. Wigmore says:

"Of the probative value of a person's habit or custom, as showing the doing of a specific occasion of the act which is the subject of the habit or custom, there can be no doubt. Every day's experience and reasoning make it clear enough (citing here opinions of several Judges).

"There is, however, much room for difference of opinion in concrete cases, owing chiefly to the indefiniteness of the motion of habit or custom. If we conceive it as involving an invariable regularity of action, there can be no doubt that this fixed sequence of acts tends strongly to show the occurrence of a given instance. But in the ordinary affairs of life a habit or custom seldom has such an invariable regularity. Hence it is easy to see why in a given instance something that may be loosely called habit or custom should be rejected, because it may not in fact have sufficient regularity to make it probable that it would be carried out in every instance or in most instances. Whether or not such sufficient regularity exists must depend largely on the circumstances of each case." 1 Wigmore on Evidence, p. 325.

We think the testimony as to the habit or custom of the deceased, in the circumstances of this case, was competent. Especially is this true, if the State could show that the habit or custom was in all probability known to the defendants, and there was some testimony so showing.

Three of the State's witnesses, Messrs. Rector, Rogers, and Williams, were allowed to testify that they were not working for any reward offered for the apprehension and conviction of the person guilty of

the murder of the deceased. Some of these witnesses were allowed to state that their information that the other witnesses were not to receive rewards came from advertising and telegrams. The defendants take the position that all this testimony was incompetent. We think it was proper for each witness to testify that he had not received, and was not to receive, any compensation, by way of reward, for his services. The interest which a witness has, or may not have, in the result of a cause is, generally, a proper subject of inquiry, for jurors should be advised as to this interest, or lack of interest, in considering the credibility of the witness.

The testimony of the witnesses as to what they had heard as to other officers who were working in the case, not receiving rewards, was, of course, hearsay, and we think it would have been better if this testimony should not have been received. In view of the fact, however, that each of the witnesses testified, of his own knowledge, that he was not to receive a reward, we do not think the "hearsay" testimony was prejudicial.

While detective Williams was on the stand, attorneys for the defendants inquired of him as to the circumstances under which the written statement of Floyd was obtained. The Circuit Judge held that it was not material as to how the statement was obtained from Floyd, taking the position that, while the defendants could inquire as to any duress under which they were situate, at the time of their declarations, this did not apply to Floyd. Another witness, amongst the officers, was permitted to state, however, upon examination for the State, that the statement of Floyd was free and voluntary. The ruling of the Circuit Judge is made the basis of one of the exceptions; and, we think, that the ruling was erroneous. It was the duty of the State, when it sought to introduce statements or declarations of the accused, to show, by some evidence, that these were free and voluntary. The defendants claimed all through

the case that any statements or declarations made by them were made under duress.  Floyd was arrested, indicted and tried as a participant in the same crime charged against the defendants, and he had admitted some connection with the crime, and charged the defendants with more culpability therein.  If any of the officers endeavored by force, threats, intimidations, or offer of reward, in any way, to induce a confession from one person, charged with complicity in the crime, it might be, or might not be, a circumstance for the jury to consider in their determination of the question, if another defendant had been subjected to the same kind of treatment by the same officers.  We think the defendants were entitled to inquire into the manner as to how Floyd's alleged confessions were secured, and the exception raising this question is sustained.

One of the attorneys assisting the Solicitor in the prosecution upon cross-examination, of Mrs. Daisy Hestor, wife of Jerry Hestor, asked of that witness these questions :

"You have been a witness for him (Jerry Hester) in other cases, have you not?"

"When he (Jerry Hestor) was arrested for arson, and tried for that, you stood by him in that?"

The Court sustained the objections to these questions. Still, the defendants complain that there was error on the ground that there was an abuse of the privilege of cross-examination.  Obviously the Judge was right in his holding that the questions were improper, since they tended to charge the defendant Jerry Hestor with a crime that had no connection with the offense for which he was on trial, and the defendant had not put his character in issue.  Most certainly the safer course for prosecuting attorneys to follow is not to ask questions, the answer to which would give information as to other crimes charged against a defendant, which have no connection whatever with the offense for which the defendant is being tried.  Under the circumstances here,

however, where the Judge was quick to rule the examination as improper, and where the attorney submitted so readily to the ruling, we hold that there was no prejudicial error.

32 Error on part of the Circuit Judge as to his charge regarding circumstantial evidence is alleged, and the particular language complained of is as follows:

"In other words, gentlemen, when the State relies upon circumstantial evidence to convict a man, every circumstance must be made out beyond a reasonable doubt, every one of them must point to his guilt, that is all the circumstances which the State relies upon. Understand me, I don't mean every circumstance that comes up in the case, but I mean all of those circumstances which the State relies on must be made out beyond a reasonabe doubt."

33 In determining if there was harmful error in the charge, the whole charge must be considered. We think all that the Circuit Judge said in his announcements as to the law of circumstantial evidence shows that he properly stated the law thereabout to the jury. As we read his charge, along this line, we think it complies with the holdings of this Court in the cases of *State v. Hudson,* 66 S. C., 394; 44 S. E., 968; 97 Am. St. Rep., 768, and *State v. Griffin,* 98 S. C., 105; 82 S. E., 254, Ann. Cas. 1916-D, 392. If the defendants desired a more extended charge as to circumstantial evidence, we think they should have made a request therefor.

34 Error is also alleged because of this statement of the law given by the Court in his charge:

"Now, * * * if the State has satisfied you that one of these defendants actually did the shooting that caused the death of Mr. Thackston, and that the other two were there, aiding and abetting in a common enterprise of attack upon Mr. Thackston, one would be just as guilty as the other one. The three, all three, would be guilty; if there were two there, if only two were engaged in it and one did the actual shooting and the other was present, aiding and abetting, then

14—S. C. 137

both would be equally guilty, one just as guilty as the other."

The ground for taking the position that the quoted language was an incorrect statement of the law is that, while all may be guilty of an offense under the conditions stated by the Judge, the parties may be convicted of different grades of homicide. At other times in the charge, the Judge gave full instruction to the jury as to the various grades of homicide, for which the defendants might be convicted, even instructing them as to the crime of manslaughter, although one of the attorneys for the defendants had announced that he saw no reason for a charge as to manslaughter. Taking the charge here complained of in connection with the other parts of the charge, we fail to find any error as charged in the exception touching this matter.

In charging the law as to the defense of alibi, the Circuit Judge made the following statement:

"When a man comes into Court and sets up what we call an alibi, he says in effect, I wasn't there at the place this thing happened, at the time it happened, and therefore I could not have had anything to do with it. Now, the law says when a man comes into Court and he sets up that defense must prove it. The burden is on him, not to prove it beyond a reasonable doubt but by the greater weight of the evidence. He must satisfy the jury by the greater weight of the evidence of his defense of alibi, but if the jury has a reasonable doubt as to whether or not he has made out his defense of alibi, they must give him the benefit of that doubt, and they must acquit him."

In the case of *State v. Stokes,* 133 S. C., 67; 130 S. E., 337, which was affirmed in *State v. Chancey* (S. C.), 132 S. E., 824, ith as been held that, while alibi is an affirmative defense (although there is much good reason for holding to the contrary), yet, in connection with that defense, the following has been held by this Court in both the cases cited:

"But this rule is subordinate to the cardinal rule in

criminal cases that the burden is unshifting on the part of the State to establish every element of the crime charged beyond a reasonable doubt to warrant a conviction * * * and, if the jury entertain a reasonable doubt on the whole case as to whether the defendant has established his alibi, the defendant is entitled to it."

In addition to what the trial Judge stated as to the law of alibi, in several instances he charged, clearly, to the effect that, if the jury had a reasonable doubt as to the guilt of the defendant, such doubt should be resolved in their favor. While the words used in the statement as to the defense of alibi were not in the exact language as laid down in the *Chancey case,* we think that the jury must have understood that, if the defendants failed to establish their plea of abili by the preponderance of the evidence, still, if the evidence as to that defense was such as to cause the jury to have a reasonable doubt as to their guilt, the defendants were entitled to such doubt. We are therefore of the opinion that the exception to the charge cannot be sustained.

In discussing the duties of a juror, the trial Judge used the following language:

"Now I want to say this, gentlemen, honest conviction never comes to a man because he wants it to come. If he is convinced of a thing, it does not make any difference what he says about it, or what he might wish about it, it is in his mind, and he cannot get rid of it. If he is not convinced, and there is not an honest conviction in his mind, it does not make any difference what he might say or what he might want; it is not there. I know that, gentlemen, from my own experience."

Counsel for the appellants think that the Judge "substituted an erroneous philosophical reflection and his own personal experience for the standard proof required by the law in a criminal case to warrant a conviction; namely, proof beyond a reasonable doubt, regardless of the mental attitude of the jury." We cannot agree with the logic or

philosophy of his Honor that "honest conviction never comes to a man because he wants it to come." We are confident that many honest men want to be convinced, and that desire on their part helps to bring to them honest conviction. The Judge, in using the language herein quoted from his charge, was instructing the jury as to their duty to render a true verdict, according to the law and evidence, and from what was said by him just preceding the quoted language, and what he said thereafter, we think the jury could not fail to understand that they were to be satisfied beyond reasonable doubt of the guilt of the defendant's before rendering a verdict finding them guilty. We see no legal error in this portion of the charge to which exception is made.

Motions for a directed verdict of not guilty in favor of the defendants Claude Hester and Charlie Hester were made; and, after conviction, motions for a new trial as to all of the defendants, was made. The grounds of these motions were that there was not sufficient competent evidence in the case to warrant the conviction of the defendants. In view of our conclusion that there will have to be a new trial as to all the defendants, we think it improper to review the testimony adduced at the trial. We simply announce that we think the Circuit Judge was correct in his refusal to grant the motions made by the defendants.

The judgment of this Court is that the judgment of the Court of General Sessions of Greenville County be, and the same is hereby, reversed as to all of the defendants, and the case is remanded to that Court for a new trial.

Mr. CHIEF JUSTICE GARY and MESSRS. JUSTICES WATTS, and STABLER concur.

Mr. JUSTICE COTHRAN (dissenting) : In the opinion of Mr. Justice Blease it is proposed to reverse the judgment of the Circuit Court principally for the following reasons: (1) That the presiding Judge erred in allowing the testimony of Sheriff Rector as to declarations made by Claude Hester,

reflecting upon the character of Jerry Hester and Charlie Hester, his father and brother, to remain in the evidence (2) that the presiding Judge erred in the admission of the testimony of the officers as to the conduct of the accused upon the respective occasions of the reading of the Floyd affidavit to them; (3) that the presiding Judge erred in the admission of the testimony of the officers as to the conduct of the accused, at the time of the statement by Floyd to them, of the contents of his affidavits; (4) that the presiding Judge erred in permitting the reading of the Floyd affidavit to the jury; (5) errors in certain detached statements in the Judge's charge.

The disposition by Mr. Justice Blease of the other points in the case, raised by the remaining exceptions, is entirely satisfactory to me, but, differing with him in his conclusions upon the five points above stated, I shall deferentially state the grounds of my dissent in reference to them:

(1) That the presiding Judge erred in allowing the testimony of Sheriff Rector, as to the declarations made by Claude Hester, reflecting upon the characters of Jerry Hester and Charlie Hester, his father and brother, to remain in the evidence.

This incident in the trial occcurred in this way; Rector, the Sheriff, was on the stand as a witness for the State. He proposed to testify to an interview which he had with Claude Hester in the presence of Rogers, the special agent, and Williams, the Pinkerton detective, in the Sheriff's private office in East Court street a few days before the arrest of Jerry Hester. When the Solicitor asked him the question, "What statement did Claude Hester make?" the Court interposed with the remark, "Now understand, that any statement made by him can effect only the man making the statement, and not either of the other defendants." The Sheriff then proceeded to detail statements made by Claude Hester denying his connction with the murder, and tending to establish an alibi for himself. Then

this followed (questions by the Sheriff and answers by Claude Hester) :

"Well, who do you think killed Mr. Thackston? I don't know. Do you think Charlie and your father did it? I would not put it past them; they are mean enough to do it."

Up to that point no objection had been interposed to the examination of the Sheriff, for the reason, evidently, that it had been of an exculpatory character, so far as Claude Hester was concerned, and of entire ingorance on his part, so far as Jerry Hester and Charlie Hester were concerned. Then the question: "Do you think Charlie and your father did it?" Still no objection; manifestly for the reason that an answer favorable to Jerry and Charlie was expected to come from the son. Counsel for the defendants recovered from their surprise at Claude Hester's answer sufficiently to say, "We object to that, your Honor," without stating the ground of the objection. No ruling was made by the Circuit Judge, and no motion was made to strike it out.

In the case of *State v. Ballew,* 83 S. C., 82; 63 S. E., 688; 64 S. E., 1019; 18 Ann. Cas. 569, quoted in the opinion of Mr. Justice Blease, the Court said:

"The general principle that a party cannot take his chances on a successful issue, reserving vices in the trial, of which he has notice, for use in case of disappointment, is universally recognized and obviously just."

By analogy, counsel has no right, after taking chances upon a favorable reply to an improper question, which he is presumed to know was improper, to object to the surprising and disappointing answer or to move to strike it out.

In view of the preliminary caution given by the Circuit Judge that nothing coming from Claude Hester could be used against the other defendants, of the failure of counsel to object to the testimony, of their manifest apprehension that the answer would be favorable, of their failure to state any ground of objection, and of their failure to move that

the objectionable answer be stricken out, I do not think that the assignment of error should be sustained.

It will be observed too, that the main ground upon which this exception is sustained, in the opinion of Mr. Justice Blease is that the alleged declaration of Claude Hester was an effective attack upon the characters of the men, when their reputations had not been put in issue. I find in the exception (11A) nothing which suggests this ground of objection.

2. That the presiding Judge erred in the admission of the testimony of the officers as to the conduct of the accused upon the respective occasions of the reading of the Floyd affidavit to them.

I have been unable to find a suggestion in a single exception which raises the point that testimony as to the conduct of the defendants, in reaction to the reading of the Floyd affidavit, was inadmissible. The only exceptions which refer to the interviews between the officers and the two defendants Jerry Hester and Charlie Hester are the twelfth, thirteenth, fourteenth, fifteenth, and sixteenth.

The twelfth exception assigns error in the "permitting the witness T. E. Williams, a Pinkerton detective, to testify as to certain statements read to the defendants Jerry and Charlie Hester, alleged to have been made by one J. C. Floyd, who was at that time under separate indictment for the same offense, but was not on trial." What the testimony of Williams was with reference to the Floyd affidavit does not appear in the exception, and I have searched the record in vain to find out. Certainly this exception does not cover the admission of testimony as to the conduct of the accused upon hearing the affidavit read.

The thirteenth exception assigns error in "permitting the witness W. W. Rogers to testify over objection that he told the defendants Charlie and Jerry Hester the contents of the Floyd affidavit. Certainly that fact could not have prejudiced the defendants; the prejudice, if any, was the

reaction of the defendants to that communication, of which there was evidence. I find nothing in this exception which complains of error in allowing testimony of the conduct of the defendants in reaction to this statement.

The fourteenth exception assigns error in permitting the witness Sheriff Rector "to testify, over objection, that he told Charlie Hester of statements alleged to have been made by J. C. Floyd." The observations as to exception 13 are equally applicable to this exception.

The fifteenth exception assigns error in "permitting the witness, W. W. Rogers, a State detective, to testify to and read the contents of an alleged written statement of one J. C. Floyd." This raises a different question which I shall discuss later. It has no bearing upon the admission of testimony as to the conduct of the defendants in reaction to the reading of the affidavit.

The sixteenth exception assigns error in permitting the witness Sheriff Rector "to testify to the contents of a written statement of one J. C. Floyd, * * * alleged to have been read to the defendants Charlie Hester and Jerry Hester." This exception is as far from raising the question of the admissibility of testimony as to the conduct of the defendants as any one of the other four.

In addition, it will be observed that exceptions 12, 13, 15 and 16 are clearly in violation of Rule 4, subdivision 6, which requires each exception to contain a concise statement of one proposition of law or fact. Each of them contains a double assignment of error, relating to the admission of testimony which affected the two defendants, events which occurred separately and at different times.

3. That the presiding Judge erred in the admission of the testimony of the officers as to the conduct of the accused at the time of the statements of Floyd to them of the contents of his affidavit.

There is less support in the exceptions, to which reference has been made above, for this contention than that just

discussed. There was not even a complaint that testimony was received of Floyd's repetition of the facts in his affidavit to the defendants, much less of the admission of testimony as to the conduct of the defendants in reaction to the verbal statements of Floyd.

4. That the presiding Judge erred in permitting the reading of the Floyd affidavit to the jury.

If it was admissible to prove that the Floyd affidavit was read to the defendants, and their reaction thereto, it was necessary to read the affidavit to the jury as the foundation of the admissibility of the evidence of reaction to show that an accusation of crime had been made directly to the defendants as much so as proof of the oral statement of Floyd to substantially the same effect; not as original evidence of the matters stated in the affidavit, which may have been entirely false or obtained improperly, but as the best evidence of the accusation. The fact that the jury may have considered it as original evidence does not affect its admissibility for the legitimate purpose indicated. This result might well be prevented by the Court's instruction. See *Green v. Atlantic Coast Line R. Co.* (S. C.), 134 S. E., 385.

In the case of *State v. Carroll*, 30 S. C., 85; 8 S. E., 433; 14 Am. St. Rep., 883, the defendant was charged with adultery. Prior to his arrest, a number of the citizens of St. Matthews, where the defendant resided, held a meeting, and passed certain resolutions in reference to his conduct. These resolutions were transmitted to the defendant. He replied by letter pledging himself to abandon his relations with the woman. Upon his trial the resolutions and his reply were introduced in evidence. Upon exceptions raising objection to the admissibility of the resolutions, the Court said:

"We do not suppose there can be a doubt that, if the persons composing the public meeting, or some of them, had gone to the appellant and verbally made to him the

statements embodied in the resolutions, to which he had verbally replied in the terms of his letter, it would have been competent to prove what passed between the parties, provided the statements made by defendant were not extorted from him by something amounting to the legal idea of duress. If so, then we are unable to perceive why the communications, which happened to be in writing, should not be quite as good, if not better, testimony than the verbal statements."

I do not think that the circumstances under which the affidavit of Floyd was obtained affects at all the obligation of the defendants to reply to it, nor do I think that the reading of the affidavit on the trial impinges at all upon the constitutional right of the accused to be confronted with the witnesses against him. The point at issue was not the truth of the affidavit; it was not offered in evidence; but the point was the reaction of the defendant after hearing it read.

5. Errors in certain detached statements in the Judge's charge.

The Circuit Judge did more, in the interest of the defendants, than he was required to do. In both the *Sudduth* and *Goodwin cases,* this Court has held that, as in the matter of express confessions, it is the province of the Judge to decide in the first instance, in cases of alleged implied confessions, whether the circumstances surrounding the accused were such as to make his silence of any significance at all. He may decide that issue and admit the evidence, and leave the force and effect of it to the jury, or he may, as the Circuit Judge did in this case, admit the evidence and leave to the jury both questions whether the silence of the accused was under such circumstances as justified its admission and its force and effect if so found. I think that the Circuit Judge as clearly and fairly presented the law as could possibly have been done, in conformity with the principles which I shall hereinafter discuss.

I am reluctant, however, in a case of such momentous

consequences to the defendants, sentenced to death, to base my conclusions upon the technical grounds above indicated, and will consider the objections to the validity of the conviction, urged by Mr. Justice Blease, as if they had been properly submitted to this Court, with extended reference particularly to the propositions advanced by him that there was error: (1) On the part of the Circuit Judge in admitting the evidence to the effect that the affidavit of Floyd was, read to the defendants, and of their reaction thereto; (2) on the part of the Circuit Judge in admitting the evidence of Floyd's verbal accusation of the defendants, and of their reaction thereto.

The circumstances attending the interview between the officers and Jerry Hester, at which the affidavit of Floyd was read to him and the verbal statements by Floyd were made to him, were as follows:

About a week after the murder of Thackston, Jerry Hester was arrested at his home, after midnight. He was taken to the private office of the Sheriff on Court street in the City of Greenville. There were present the Sheriff, Rector, the special State agent, Rogers, and a Pinkerton detective, Williams, who had been employed by the family. In the meantime a written statement, in the form of an affidavit, had been procured from one J. C. Floyd. It gave an account of Floyd's connection with the crime and a direct charge of the defendant's planning and executing the murder. At the interview referred to, Rogers, the State agent, read the Floyd affidavit in full to Jerry Hester. Rogers testified that, after the reading of the affidavit to Jerry Hester, "He never opened his mouth, only hung his head. He sat there for approximately 5 or 8 minutes. I says: 'Well you have got nothing to say?' He hesitated again, casually throwed his hands and says: 'I will tell my tale when I get in' Court.' " Floyd, who was at the time under arrest for the crime and in jail, was sent for. After Floyd had been ushered into the presence of Jerry Hester, according to the

testimony of the same witness, Rogers: "I told him, 'Now Capt. Jerry, here is Mr. Floyd. I have read you his statement; any questions you want to ask him about it?' At first he said, 'No.' Mr. Floyd got to talking with him then, and practically repeated the whole thing to Jerry." Upon being asked "what was his manner as Floyd came in?" the witness answered, "Just kinder wilted down, and he never disputed it with Floyd." Floyd practicaly went over the matters contained in his affidavit to Jerry Hester, and told him that he knew everything he had said was true. Jerry Hester made no denial to this statement. The witness was asked, "What was his manner?" and replied: "Just sitting there with his head hanging down. Don't think he looked at him (Floyd) much."

The correct practice in reference to the admission of evidence tending to show the silence of the defendant under an accusation of crime is clearly defined in the case of *State v. Sudduth,* 74 S. C., 498; 54 S. E., 1013:

"Two questions always arise as to the effect of silence under accusation: First, are the circumstances surrounding the accused such as to make his silence of any significance at all? This is a question of fact to be decided by the Circuit Judge, and his conclusion will not be disturbed by this Court, unless without any reasonable support."

In *State v. Goodwin,* 127 S. C., 107; 120 S. E., 496, it is said:

"The admission of such evidence is strongly assimilated to the admission of a confession; in fact, it is sometimes spoken of as an implied confession. When a confession is offered as voluntary, the question of whether or not it is voluntary must be determined, in the first instance, by the presiding Judge."

And:

"The question now for decision is whether or not the presiding Judge correctly decided, in the first instance, that the testimony under the circumstances, was of sufficient

significance to justify a consideration of it from any angle by the jury."

So the turning point of this inquiry is whether, in the first instance, the presiding Judge correctly decided that the testimony, under the circumstances, was of sufficient significance to justify a consideration of it, from any angle, by the jury.

Upon this question I have not the slightest doubt. Whilst it is true that the defendant was under arrest at the time, the evidence does not disclose the slightest improper conduct on the part of the officers who had him in charge. Their most commendable purpose appears to have been to learn and apprehend the perpetrators of this dastardly, cowardly murder for robbery; a purpose which I do not think should be readily thwarted or constricted.

In his opinion Mr. Justice Blease declares:

"We have no intention of criticizing the conduct of the officers, and in many respects they are to be commended for their zeal and persistence in attempting to ferret out those who were guilty of the cruel murder of Mr. Thackston."

So we start with the irreproachable conduct of the officers, and with the presumption in favor of the presiding Judge's ruling, which should be reversed only upon a very decided conviction on the part of this Court, that it was "without any reasonable support," in the language of the *Sudduth case,* above quoted.

I think that it is only necessary to read the very clear and fair abstract of the testimony contained in the opinion of Mr. Justice Blease to be convinced that there were material circumstances in connection with the statements made by the defendant, upon which the inadmissibility of the testimony is placed, that justified the presiding Judge in admitting the testimony, and submitting the whole matter to the jury. The circumstances which I think fully justified the ruling of the presiding Judge were these: After the

Floyd affidavit was read to Jerry Hester, "he never opened his mouth, only hung his head. He sat there for approximately 5 or 8 minutes. I says. 'Well, you have got nothing to say?' He hesitated again, casually throwed his hands, and says. 'I will tell my tale when I get in Court.'" If this belated statement shall be relied upon as effectually neutralizing the effect of the testimony, it seems only fair to consider along with it the circumstances which preceded it. Certainly such belated statement, preceded by his extraordinary demeanor, always indicative of overwhelming consciousness of guilt, should not be allowed the same effect as if it had been promptly and spontaneously made. After Floyd had come in and made a statement to Jerry Hester, repeating the substance of this affidavit directly to Jerry Hester, he "just kinder wilted down and never disputed it with Floyd." Floyd went over his statement, and told Jerry Hester that he (Jerry) knew that everything he (Floyd) had said was true, and that Jerry made no denial; "he was just sitting there with his heading down. Don't think he looked at him (Floyd) much."

The circumstances of the interview meet all the requirements laid down in the extract from Greenleaf on Evidence, quoted in the *Sudduth case,* and in the decision of this Court in the *Goodwin case.* They show the act of the mind, the conduct of the party, that he knew what he was doing, that he fully understood the statement read to him, that he was not only afforded an opportunity to act or speak, but urged to do so, and were such as properly and naturally called for some action or reply from a man similarly situated. The evidence was of direct declarations of that kind which naturally calls for contradiction. The statements were directly addressed to him. He was fully aware of his right to reply to them and presumptively of the consequences of his not doing so. He had the opportunity to reply. He was not overwhelmed by fear, distress, or the belief that nothing he could say would avail. He was not only expected to reply,

but urged to do so.   He could not have been under any apprehension that a simple denial would have been distorted either intentionally or by frailty of memory.   If the officers had had any intention to falsely report his reply or conduct, they had every opportunity to do so, which manifestly they did not avail themselves of.

Two theories are suggested in the opinion of Mr. Justice Blease, upon which the execution of the testimony should be sustained.   It is not clear that he has committed himself to either theory, although there are indications that he approves one or both.   Certain it is that the adoption of one or the other can be the only justification for the exclusion.   They are: (1) That under the case of *State v. Edwards,* 13 S. C., 30, a man accused of crime, under all circumstances, has the right to stand mute, and that for that reason his silence is not a fact which the jury is entitled to weigh against him; (2) that the fact that a person is under arrest, in the custody of officers, prevents his silence or the statements themselvs from being admissible against him, on the ground that under such circumstances he is not called upon to speak.

As to the first theory:   The matrix of this theory may be found in the case of *State v. Edwards,* 13 S. C., 30.   It was not necessary to a decision in that case, and I do not believe that it can be found anywhere else.   There the Circuit Judge charged the jury "that if a party hears a criminal charge against himsef, and made in his presence, and says nothing, it is an admission on his part, and, in the eye of the law, the party accepts that charge as his confession."   As a matter of course this charge could not have been sustained. The Court held it error, saying:

"The effect of this charge was to give the silence of the parties the legal force and effect of confession of guilt," —and followed with this statement:

"It must in this respect be distinguished from the proposition that the conduct of parties under accusation of crime

may be given to the jury, as circumstances to be weighed in connection with the question of guilt or innocence."

Up to this point the opinion is free from criticism. The law was properly declared that the defndant's silence under accusation was not, *per se,* a confession of guilt, but was a circumstances to be considered by the jury. What follows has produced some confusion:

"To give the silence of parties such legal effect (that is, the admission of guilt) is equivalent to holding that every person accused of crime by any person, regardless of time, place, or circumstances, is bound to deny such accusation and affirm his innocence. It is clear that the law imposes no such obligation on a party accused; but, on the contrary, it is his right to stand mute, and the burden of showing the guilt is on those that make the accusation."

What this means, as I understand it, taken in connection with the portion of the opinion above quoted, is that, while he may have the legal right to stand mute, his conduct in standing mute may be given to the jury as a circumstance to be weighed in connection with the question of guilt or innocence. The defendant Jerry Hester had the legal right to "wilt," to hang his head, to squirm and twist, to avert his eyes from the accusing Floyd. The fact that he had such legal right does not militate against the admission of the evidence. He had the legal right to make a full confesson. I do not apprehend that, because in doing so he was exercising a legal right, evidence of the confession would be inadmissible. If the decision means that because he had the legal right to stand mute, evidence of that fact is inadmissible, it is plainly inconsistent with the previous paragraph, and opposed to the overwhelming weight of authority.

"Where on being accused of crime, with full liberty to speak, one remains silent, his failure to reply or to deny is relevant as tending to show his guilt, and the accusatory or incriminating statement is admissible, not as evidence of

the truth of the facts stated, but to show accused's admission by silence. Silence alone, however, raises no legal presumption of guilt. Its effect is for the jury, and from it, in connection with other facts and circumstances, they may infer that accused is guilty." 16 C. J., 629.

In *State v. Stone,* Rice 147, the following charge was approved by the Court:

"When a man was charged with a crime, and did not deny it, we should be usually led to conclude that he was guilty, on the principle of the old adage, 'silence gives consent.'"

In *State v. Major,* 70 S. C., 387; 50 S. E., 13, it is said:

"While silence under accusation of crime cannot have the legal effect of the confession of guilt, it is nevertheless a circumstance to go to a jury on a question of his guilt or innocence."

In the case of *State v. Senn,* 32 S. C., 392; 11 S. E., 292, the statement which the State offered to prove as having been made in the presence of the defendant, to which he made no reply, was made in a judicial examination, and was held inadmissible. The case has but little bearing upon the issues in the case at bar other than that it states the general rule of silence under accusation of crime.

"The conduct of parties under accusation for crime may be given to the jury as circumstances to be weighed in connection with the question of guilt or innocence." *State v. Major,* 70 S. C., 387; 50 S. E., 13.

In *State v. Sudduth,* 74 S. C., 498; 54 S. E., 1013, the principle is recognized that silence under accusation of crime is a circumstance to be submitted to the jury as tending to show the guilt of the defendant.

In *State v. McIntosh,* 94 S. C., 439; 78 S. E., 327, the Court said:

"Statements made in the presence of a party are generally admissible, if he remains silent when they are made, and the circumstances are such that he can speak, and naturally would or ought to respond to them. In such circumstances

his silence may afford ground for inferring that he acquiesces in the truth of the statements."

"So, also, if he positively and unequivocally denies the truth of such statements, * * * they are inadmissible." *State v. McIntosh,* 94 S. C., 439; 78 S. E., 327.

In the case of *State v. Goodwin,* 127 S. C., 107, the testimony of the defendant's silence under accusation was excluded, not upon the ground that he had the legal right to stand mute, but upon the ground that the accusation was not made under circumstances that called for a reply by the defendant, by implication recognizing the general rule above stated.

"The manner, the demeanor, of a party when accused of crime, as well as his silence in such circumstances, when, if not guilty, truth born of indignant innocence would naturally impel him to speak, are always fit subjects to be brought before the jury as inculpatory circumstances, of whose probative force the triers of the fact must judge." *State v. Hill,* 134 Mo., 663; 36 S. W., 223.

In not one of the *South Carolina cases,* since the case of *State v. Edwards* was decided, has it been declared that the defendant, under accusation of crime, has the right to stand mute, or that that right makes the fact of his standing mute inadmissible. In every one of them it is declared that, if the accusation is made to him directly or in his presence, under circumstances which naturally call for a reply, with the opportunity of replying, the fact of silence may be offered in evidence as an indication of his guilt for the jury to pass upon.

"Silence of defendant, when accusatory statement is read to him and he is given opportunity to reply, held proper evidence indicating admission of guilt." *People v. Egan* (Cal. App.), 246 P., 337.

"It has become a well-established rule that when a defendant, under conditions which fairly afford him an opportunity to reply, stands mute in the face of an accusation of crime,

the circumstance of his silence may be taken against him as evidence indicating an admission of guilt." *People v. Bringhurst,* 192 Cal., 748; 221 P., 897.

"Where a charge is made in the presence and hearing of a person accusing him of a crime, his silence or failure to contradict or explain the statement, may be shown as being in the nature of an admission of the truth of such statements, providing the circumstances are such as to afford him an opportunity to speak and such as would naturally call for some action or reply from persons similarly situated." *Diamond v. State,* 195 Ind., 285; 144 N. E., 250, 466.

In *Steele v. State,* 19 Ala. App., 598; 99 So., 745, it was held that, when the defendant made no response to the statement of the deceased accusing him, but dropped his head and looked the other way, his silence and demeanor were both the subject of evidence.

As to the second theory that the circumstances that the defendant is under arrest and is being interrogated by the officers having him in custody, his silence will not justify the admission of the accusation or of his reaction thereto.

This presents a most serious proposition—serious to the defendant, and serious to the administration of justice in the detection of crime. To sustain it will hamper the legitimate efforts of assiduous officers, and may lead to the escape of many red-handed murderers.

It must be remembered that in the case at bar there is no evidence of any improper conduct on the part of the officers who had the defendants Jerry Hester and Charlie Hester, at different times, under investigation. In fact, as has been adverted to, in the opinion of Mr. Justice Blease, they are not only relieved of all criticism, but actually commended for their zeal and persistence. That being conceded, I cannot see any reason for a distinction between officers engaged in a proper and commendable effort to discover the perpetrators of an awful crime and persons who are not officers of the law, so far as the admission of

the evidence is concerned. I can well understand that the force and effect of the evidence, in the minds of the jury, after its reception, of course, may. be weakened or entirely fail, if the conduct of the officers be shown to have been such as to deprive the defendants of the right, duty, or opportunity to reply, but that should not affect its admissibility.

In 16 C. J., 633, it is said:

"Some of the Courts have held that the fact that one is under arrest and in the custody of an officer, when he is silent under an accusation, prevents his silence or the statements themselves from being admissible against him on the ground that under such circumstances he is not called upon to speak."

To sustain this proposition 29 cases from the Circuit Court of appeals, Iowa, Kentucky, Louisiana, Massachusetts, Missouri, Oklahoma, Rhode Island, Texas, and Quebec, are cited. I have personally examined 27 of them, and, with the exception of 3, they present instances of declarations, not made to the accused, but to officers in his presence. The excepted cases are simply instances of the accused's failure to answer questions put to him by the officers. Not one presents an instance like the case at bar where the statements were made directly to the defendants, calling for answers, and with every opportunity to answer open to them.

In connection with the above quotation from C. J., is the following:

"Other Courts have held that this circumstance alone does not render the evidence inadmissible, and that an accusation of crime calls for reply even from a person under arrest or in the custody of an officer, where the circumstances surrounding him indicated that he is free to answer if he chooses to do so."

This proposition is sustained by cases from Alabama, Arkansas, California, New York, Ohio, Tennessee, West Virginia, and Michigan, and in my opinion is the better rule;

the circumstances of being under arrest and the accusation not being directly made to the defendant being left to the jury to determine whether he was then called upon to make reply.

In *State v. Booker,* 68 W. Va., 869 S. E., 295, it was held:

"Unrefuted evidence of silence by one when charged with a crime in his hearing by his coindictee, though the party remaining silent be under arrest or in custody, is admissible for the consideration of the jury when the circumstances are such that an innocent man similarly situated would naturally speak in denial."

"Evidence as to accusatory statements made in acccused's presence naturally calling for a reply, and not replied to, was not inadmissible because accused at the time was in custody." *Simmons v. State,* 7 Ala., App. 107; 61 So., 466; *People v. Amaya,* 134 Cal., 531; 66 P., 794; *State v. Guffey,* 39 S. D., 84; 163 N. W., 679.

In *People v. Sullivan,* 3 Cal., App. 502; 86 P., 834, the defendant was under arrest, in the custody of several policemen who carried him to the hospital where the man who later died was on the operating table. The wounded man made statements incriminating the defendant, who made no reply. Held, that the testimony as to such statements and the silence of the defendant was admissible. The Court said:

"It has been held that silence, when a party is under arrest, does not sustain the hypothesis of acquiescence, because the party is not free to speak. But our Supreme Court holds that an accusation of crime does call for a reply, even from a person under arrest."

Even in cases of express, as distinguished from this class of implied, confessions, where the rule naturally would be stricter, it has been frequently held by the United States Supreme Court that the fact that the defendant was under arrest, in the custody of officers, and even in irons, does not render the confession inadmissible.

In the case of *Sparf v. U. S.*, 156 U. S., 51; 715; 15 S. Ct., 273; 39 L. Ed., 343; the defendants were in irons on a ship, arrested and charged with murder. One of the defendants confessed in the presence of the defendant, Sparf. The Court held:

"The declarations of Hansen after the killing, as detailed by Green and Larsen, were also admissible in evidence against Sparf, because they appear to have been made in his presence and under such circumstances as would warrant the inference that he would naturally have contradicted them if he did not assent to their truth."

"The fact that he is in custody and manacled does not necessarily render his statement involuntary." *Wilson v. U. S.*, 162 U. S., 613; 16 S. Ct., 895; 40 L. Ed., 1090.

"The admission of certain statements made by the defendants while they were under arrest and handcuffed was also objected to. * * * Confessions are not rendered inadmissible by the fact that the parties are in custody, provided that such confessions are not extorted by inducements or threats." *Pierce v. U. S.*, 160 U. S., 355; 16 S. Ct., 321; 40 L. Ed., 454.

"It is true that the fact of a prisoner being in custody at the time he makes a confession is a circumstance not to be overlooked, because it bears upon the inquiry whether the confession was voluntarily made or was extorted by threats or violence or made under the influence of fear. But confinement or imprisonment is not in itself sufficient to justify the exclusion of a confession, if it appears to have been voluntary, and was not obtained by putting the prisoner in fear or by promises." *Sparf v. U. S.*, 156 U. S., 51; 715; 15 S. Ct., 273; 39 L. Ed., 343.

"In this Court also it has been settled that the mere fact that the confession is made to a police officer, while the accused was under arrest in or out of prison, or was drawn out by his questions, does not necessarily render the confession involuntary, but, as one of the circumstances, such

imprisonment or interrogation may be taken into account in determining whether or not the statements of the prisoner were voluntary." *Bram v. U. S.,* 168 U. S., 532; 18 S. Ct., 183; 42 L. Ed., 568.

"So far as appears, there was nothing in the circumstances under which Bilokumsky was examined which would have rendered his answer inadmissible even in a criminal case. The mere fact that it was given while he was in confinement would not make it so." *Bilokumsky v. U. S.,* 263 U. S., 149; 44 S. Ct., 54; 68 L. Ed., 221.

"A confession may have been given voluntarily, although it was made to police officers while the maker was in custody, and in answer to an examination conducted by them." *Ziang Sung Wan v. U. S.,* 266 U. S., 1; 45 S. Ct., 1; 69 L. Ed., 131.

If Jerry Hester had calmly stated in the first instance: "I will tell my tale in Court," that would have effectually blocked the introduction of the evidence. But he did not do so. He sat silent under the dreadful charge, with his head hung down, and only used the expression referred to when he was urged to make some reply. Certainly his conduct before making the statement was admissible for the consideration of the jury upon the sincerity of his later remark. They may have considered it an evasion which, under the circumstances, did not mitigate the effect of his damning silence and conduct indicative of guilt. The great virtue of a denial upon accusation of crime is its spontaneity.

In *Price v. U. S.* (C. C. A.), 5 F. (2d), 650, it was held that, when the defendant was silent under an accusation, and later denied the charge, the fact of his initial silence might be proved as effecting the weight of his later denial.

The circumstances attending the interview between the officers and Charlie Hester, at which the affidavit of Floyd was read to him, and the verbal statements by Floyd were made to him, were practically identical with that between the officers and Jerry Hester: The morning after the inter-

view with Jerry Hester, being under arrest for the crime, was taken to the private office of the Sheriff on Court street. There were present the same officers. The Floyd affidavit was read to him by Rogers, who testified that when it was finished, "And he (Charlie) never opened his mouth." Floyd was sent for from the jail, and after he came "went over the whole thing, and Floyd made the statement to him (Charlie Hester) about meeting him as he and his brother Cromer was going out"; that Charlie asked Floyd, "Are you sure you met me?" and Floyd replied: "You know that I met you"; that Floyd "accused him of it just exactly what is in that statement, and Charlie sat there." The Sheriff then went over and touched Charlie, and said, "Look here, boy, are you going to lay there and let a man accuse you of murder and send you to the electric chair, and you never resent it or never say a blessed word?" and in a few minutes Charlie looked at Floyd and said, "You are a liar." Floyd replied with heat, and said, "You know I am telling the truth," to which Charlie made no reply. Certainaly, as in the case of Jerry, such a belated statement, as a denial, preceded and followed by his silence, indicative of guilt, should not be allowed the same effect as if it had been promptly and spontaneously made as the natural reaction to such a bloody charge.

If Charlie Hester had promptly denied the statements made by Floyd, I think that there would have been just ground for excluding the testimony. He did not do so until he was importuned to say something. Then his reaction from the stunning disclosure of Floyd, overwhelming him with a consciouness of guilt into silence, had had time to take effect, and the propriety of denial had become apparent. Surely the jury had the right to consider, not only the denial, but the circumstances under which it was made. They had the right to assume that an innocent man, under such a damning charge, would have instantly and indignantly denied it.

The circumstances justifying the Circuit Judge in first admitting the reading of the affidavit and the verbal accusation by Floyd are equally as strong as in the case of Jerry Hester. It is significant, very, that, after hearing Floyd's affidavit read, Charlie had no comment as to its damning impeachment than the trifling question, "Are you sure you met me?" It certainly cannot be said that the primal decision of the Circuit Judge to receive the evidence was "without any reasonable support."

The case strongly relied upon by Mr. Justice Blease (*O'Hearn v. State,* 79 Neb., 513; 113 N. W., 130; 25 L. R. A. [N. S.] 542) is an exceedingly interesting one, and ably discussed in the opinion by Justice Letton. It has, however, marked circumstances of distinction from the case at bar. There the affidavit of one of the conspirators was read in the presence of the defendant, not directly to him as in the case at bar; and when, after it had been read, the defendant was asked by one of the officers if he wanted to make any statement in regard to it, he promptly replied that he did not, that he would make his statement at the proper time, or that he would stand trial and tell his story then, as the witnesses variously testified. It seems strange that there could have been any doubt as to the inadmissibility of the evidence under these circumstances, as the Court said:

"The fact that the defendant reserved his statement until some future time is far from giving countenance to the idea that he thereby assented to the statement which had been read in his hearing. So far from giving color to the idea of assent, it rather conveys to an unprejudiced mind the idea of dissent and the intention to tell the true facts himself."

This certainly cannot be said of the conduct of either of the defendants in this case.

The *O'Hearn case* is interesting from another view. Upon the question of silence in the presence of officers having defendant in custody, the Court says:

"While the presumptions are against the theory that the silence of a prisoner gives his assent to statements made in his presence, accusing him of crime, it is unnecessary to decide in this case that in no event and under no circumstances can a tacit admission of the truth of a statement made against his in his presence be made by a person under arrest for a crime."

I am of opinion that the judgment should be affirmed.