TAYLOR, Presiding Judge.
The appellant, James Franklin Limbaugh, Jr., was convicted of murder, in violation of § 13A-6-2(a)(l), Code of Alabama 1975. The trial court sentenced Limbaugh to life imprisonment. The court ordered appellant to pay restitution and also assessed the maximum crime victim’s compensation allowed in such cases, $10,000.
The evidence as presented by the State tended to establish that on Friday night, January 23, 1987, Dennis Chandler was *583 killed. His mutilated body was thrown into the Tallasseehatchee Creek in an area known as the Blue Hole.
Earlier that evening, Chandler had picked up appellant “Junior” Limbaugh, Billy Helton, and Robert “Cub” Barnes, Jr. These four rode around drinking Jack Daniels whiskey and beer. There was testimony that the victim said and did various things to offend the other three, and that he was beaten, kicked, and stabbed by them, and that his throat was cut twice. Cub Barnes was seen wiping the blood from his knife blade saying, “He ain’t going to say nothing more.” They dragged Chandler’s corpse to the creek, took the money in his billfold, and made their way back to their homes to clean the blood off themselves and off their clothing.
A few days later, appellant, who had been unemployed for a long period of time prior to this incident, suddenly secured a job in Texas. He moved there quickly, leaving his new address with only his father, even withholding this information from his wife.
Both Cub Barnes and Billy Helton pleaded guilty to this gruesome murder, and they are currently serving time in prison. At the conclusion of the case for the defense, the State called Helton as a rebuttal witness. When the questions turned to serious inferences about his guilt and the guilt of the appellant, Helton refused to answer any further questions, invoking his Fifth Amendment privilege against self-incrimination. The court, however, ruled that the witness had no Fifth Amendment right, since “you can’t incriminate yourself if you have already been convicted or sentenced” and because the time for an appeal had expired. The court then instructed the witness to answer, but he continued to refuse. The prosecutor then attempted to read Helton’s statement, line by line, under the guise of questioning him. Many serious inferences and innuendoes of appellant’s guilt were read into the record under this guise — to the prejudice of appellant.
Appellant contends that the court erred in allowing such questioning. He argues that it would be impossible for his counsel to cross-examine a witness who never answered a question on direct examination. Appellant states that the jury may have treated the prosecutor’s many inferences as substantial evidence of appellant’s guilt, though the witness never answered any of those questions. Appellant asserts that he was, by this subterfuge, denied the right of cross-examination secured by the Confrontation Clause of the Sixth Amendment.
Although defense counsel initially objected that the qüestions were not legitimate “rebuttal” questions, he perceived the stra-tegem and stated, “He’s going down this whole statement....” The prosecutor, however, continued to go down the entire statement, reading each and every item and drawing an inference therefrom. Such “questioning,” permitted to continue over numerous objections, presents for review on appeal the issue of denial of a federal constitutional right. Douglas v. Alabama, 380 U.S. 415, 421-22, 85 S.Ct. 1074, 1078-79, 13 L.Ed.2d 934 (1965).
The following is an excerpt from the record:
“DIRECT EXAMINATION BY MR. RUMSEY:
Q: Would you state your name to the court, please?
“A: William Alfred Helton.
“Q: And you go by Billy?
“A: Yes, sir.
“Q: Billy, let me ask you this, if when you were leaving going to the Blue Hole with Cub Barnes and the defendant, Junior Limbaugh, and Dennis Chandler, if Junior Limbaugh didn’t say this, or this, in substance to you or to Cub, ‘You know what we are going to have to do, don’t you?’ And Junior said, ‘We are going to have to kill him.’
“A: I have been advised not to answer any questions.
“Q: Well, Judge, we don’t think — who have you been advised by?
“A: My lawyer and all.
“Q: Your lawyer and all?
“A: Well, I’m going to plead the 5th.
*584 “Q: Let me ask you this.. I believe you have been convicted in this case of murder and you pleaded guilty to it; didn’t you, Billy
“A: Yes, sir.
“Q: And you got a life sentence; didn’t you? And you wanted to plead to 20 and you wanted to plead to 25 and you wanted to plead to 30 and I wouldn’t take that.
“MR. LOVE: Please the Court, I want to object to it—
“Q: Now, they went into it earlier.
“MR. LOVE: Well, the plea bargain — He can show the plea of guilt and the sentence, but he can’t go into any of this plea bargain.
“Q: Oh, yes, sir. You can’t even go into the fact that there is a plead guilty [sic], but Tom went into it a while ago. I reserved the right to be able to go into it.
“MR. LOVE: Well, we object to it.
“Q: And I rejected it; didn’t I, Billy?
“MR. LOVE: Wait a minute. I object to it, if it please the Court.
“THE COURT: I overrule.
“Q: And I told your lawyer that I would recommend the maximum sentence of life; didn’t I?
“MR. LOVE: I object to that. What took place in his trial.
“THE COURT: Overruled.
“MR. LOVE: We except.
“Q: You got the maximum sentence of life, didn't you, Billy?
“A: Yes.
“Q: Now, Judge — I believe you pleaded guilty in June; didn’t you, Billy?
“A: Yes.
“Q: The week of June 15, didn’t you, Billy?
“A: The 10th.
“Q: The 10th. Excuse me. And I believe you have not appealed your conviction, have you?
“A: No, sir, I didn’t.
“Q: Judge, we now show to the court that he has entered a plea of guilty. He’s been sentenced. In fact, you were sentenced on the day that you pleaded?
“A: Yes, sir.
‘Q: And you were sentenced to life; weren’t you, Billy? He has been sentenced. He’s pled guilty. The 42 days to appeal has run. He does not have a 5th Amendment privilege — self incrimination. I think I have the right to ask him the questions and have Your Honor instruct him to answer them. If you want to take it up outside the jury, I’ll be glad to.
“THE COURT: I need you to go back to the jury room for just a few minutes. Don’t talk about the case while you are back there.
“(THE JURY GOES TO JURY ROOM AND THE FOLLOWING PROCEEDINGS WERE HAD WITH THE DEFENDANT AND HIS COUNSEL PRESENT ALL OUTSIDE THE PRESENCE AND HEARING OF THE JURY)
“MR. RUMSEY: Judge, our contention is that he does not have a 5th Amendment privilege. He has pleaded guilty. He has been sentenced and his appeal time has run and therefore, he does not any longer have a 5th Amendment privilege. ■
“THE COURT: You say you talked to your lawyer. Who is your lawyer?
“MR. RUMSEY: He doesn’t have a lawyer anymore. His services have been terminated.
“THE COURT: He said he talked to a lawyer. I just wondered who he talked to.
“MR. RUMSEY: Steve Giddens is his lawyer. And you know, I want to ask certain questions in the presence of the jury and Your Honor instruct him to answer them.
“THE COURT: Mr. Giddens, you don’t represent this gentleman anymore; do you?
“MR. STEVE GIDDENS: Judge, in my opinion, just because I have been appointed to represent somebody that has been sentenced, if he calls on me, I feel obligated to advise him and that’s what I did. I advised him not to. I don’t deny that.
*585 “MR. RUMSEY: I’m not questioning his right to advise him to anything he desires to. It’s just that there is no 5th Amendment privilege pending.
“THE COURT: The questions would be relative to the crime to which he has already pleaded guilty to and been sentenced, I would assume, wouldn’t they?
“MR. RUMSEY: Yes, sir, and the appeal time has run.
“THE COURT: You can’t incriminate yourself if you have already been convicted or sentenced. I think you have the right to ask the questions, and I’ll instruct the witness to answer. As long as the questions are relative to this particular crime that he’s been found guilty of.
“MR. RUMSEY: Yes, sir. I ask that they be brought back in.
“THE COURT: Bring the jury back in. “(JURY RETURNS TO COURTROOM AND THE FOLLOWING PROCEEDINGS WERE HAD WITH THE DEFENDANT AND HIS COUNSEL PRESENT IN OPEN COURT ALL INSIDE THE PRESENCE AND HEARING OF THE JURY) “(COUNSEL APPROACHED THE BENCH AND THE FOLLOWING DISCUSSION WAS HAD OUTSIDE THE HEARING OF THE JURY)
“MR. LOVE: Mr. Rumsey, I will have to object to anything that’s not rebuttal.
“MR. RUMSEY: Well, it is certainly rebuttal.
“THE COURT: It will have to be something in that line, I’m sure. “(DISCUSSION AT BENCH CONCLUDED)
“FURTHER EXAMINATION OF MR. HELTON BY MR. RUMSEY:
“Q: Mr. Helton, you remember a statement being taken from you at 1:15 the morning of February 3, 1987 at the Syla-cauga Police Department to Lester Nicholson, Ann Wallace, this lady seated right here and Dennis Surrett?
“A: Yes, sir.
“Q: I’ll ask you if on that occasion if you told them that after Dennis Chandler had been beaten and on the way to the Blue Hole, if Junior Limbaugh said, ‘We are going to have to kill him’?
“A: I’m not answering your questions.
“Q: We would ask — Your Honor, he does not have his privilege of self incrimination — that he be instructed to answer.
“THE COURT: Mr. Helton, you are hereby instructed by this Court to answer that question.
“A: I won’t answer them.
“THE COURT: What is your next question?
“Q: Did you tell Barnes and Limbaugh in that same trip from where he had been beaten and kicked earlier on the road down to the Blue Hole, that ‘we done whipped his ass. There wasn’t no sense in killing him’?
“A: I’m not answering no questions.
“Q: Did you tell them that after you got to the Blue Hole that Junior hit and kicked him a bunch of times?
“A: I am not answering any questions.
“Q: Did you tell them that Cub hit and kicked him a bunch of times?
“MR. LOVE: I’m going to object to that. That’s not rebuttal.
Q: Yes, sir.
“MR. LOVE: Not about Cub.
“Q: I’ll withdraw it about Cub. Did you tell that they pulled him out and started whipping on him again?
“MR. LOVE: I object to that, if it please the Court. That’s not rebuttal.
“Q: Them being — Limbaugh would be in them.
“MR. LOVE: I object.
“THE COURT: It’s not specific enough to be rebuttal. Move on to your next question.
“Q: Did you say that he did not say anything down there? Talking about Chandler.
“MR. LOVE: I object to that. That’s not rebuttal.
“Q: Yes, sir, it is. I asked him specifically after they left the beating all the way down as to whether or not he said any *586 thing. He kept saying, ‘He didn't say anything to me.’
“THE COURT: Overruled as to that.
“MR. LOVE: We except.
“Q: What was your answer to that?
“A: I won’t answer.
“Q: Did Cub say — holler, ‘He ain’t gonna be able to tell nobody nothing’?
“MR. LOVE: Now, I object to that. That certainly is not rebuttal, Judge. He’s going down this whole statement and it is not rebuttal.
“Q: I’ll withdraw it, Judge. I think he did admit to that. Did you say — did Cub holler for Junior and Junior went back there and they started dragging him to the creek and they hollered for me, so I went and helped them?
“A: No answer.
“Q: Did Cub and Junior start dragging him at first?
“A: No answer.
“Q: Were y’all dragging him by the arms or feet?
“MR. LOVE: I object that that now. That’s not rebuttal. At this time, I want to ask for a new trial on the basis of the misconduct of the District Attroney, asking questions he knows is not rebuttal.
“THE COURT: Overruled.
“MR. LOVE: We except.
“Q: Did you say that Junior had him by the arm or shirt one [sic]?
“A: No answer.
“Q: Did you say that when ya'll were dragging him, that he made a choking sound?
“MR. LOVE: I object again, if it please the Court. That’s not rebuttal.
“Q: Now, that was—
“THE COURT: I overrule to that. I think that there has been some testimony about who was dragging prior to that question.
“MR. LOVE: We except.
“THE COURT: And your answer is what?
“A: I ain’t got no answer.
“Q: Did Cub cut him again?
“A: No answer.
“Q: Did you hand the billfold out of the back seat to Junior before—
“MR. LOVE: I object to that.
“THE COURT: Overruled.
“MR. LOVE: We except.
“A: No answer.
“Q: You are refusing to answer all of them?
“A: Yes, sir.
“Q: Did you hand — Did you say that the billfold had been laying in the back seat the whole time you handed it to Junior?
“A: No answer.
“MR. LOVE: Wait just a minute. I’m objecting to that. That’s not rebuttal.
“Q: Junior said he hasn’t seen no billfold—
“THE COURT: Overruled.
“MR. LOVE: We except.
“Q: Did Junior hand it back to you when you were going across the field and you just threw it down?
“A: No answer.
“MR. LOVE: I object.
“THE COURT: Overruled.
“Q: Did you say there was a twenty dollar bill, a five, or six or seven and that ya’ll bought beer with it and went to the Sack House and drank it?
“A: No answer.
“MR. LOVE: Wait a minute. I want to object to that Judge.
“Q: Did y’all go buy beer and whiskey and go back to the Sack House?
“MR. LOVE: I object to that. Once again, I ask for a mistrial on the basis of the District Attorney trying—
“THE COURT: I sustain to that question. I think he testified they went to the house, but I overrule your motion for a mistrial.
*587 “Q: Did you say that Cub and Junior were whipping on him down there by the bridge?
“A: No answer.
“Q: Did you say that when he slapped Cub, Junior came over the front seat and got into the back seat and started hitting on him?
“MR. LOVE: I object to that. That’s not rebuttal.
“THE COURT: Overruled.
“MR. LOVE: We except.
“Q: And the three of y’all worked on him pretty good right there?
“MR. LOVE: I object to that.
“THE COURT: Overruled.
“MR. LOVE: We except.
“THE COURT: What was your answer? “A: No answer.
“Q: And that they hit him and kicked him a bunch?
“A: No answer.
“Q: That they put him back in the car? “A: No answer.
“MR. LOVE: If it please the Court, I want to object again to him trying to go down the statement—
“Q: That’s all I have.
“MR. LOVE: Wait a minute — on the pretense of impeachment.
“Q: It’s not impeachment.
“MR. LOVE: Impeachment of the defendant.
“Q: That’s all I have. I don’t have any further questions. He’s not going to answer anything. That’s all I have.
“THE COURT: Any questions?
“MR. LOVE: No, sir.”
The jury then left the courtroom for the day. Defense counsel made another motion for mistrial, which was denied.
“ ‘It is error for the prosecution to call an accomplice or another witness to testify for the state if he knows the witness will invoke the Fifth Amendment.’ N. Chiarkas, Alabama Criminal Trial Practice 219 (1981). See Busby v. State, 412 So.2d 837 (Ala.Cr.App.1982); Shockley v. State, 335 So.2d 659 (Ala.Cr.App. 1975), affirmed, 335 So.2d 663 (Ala.1976); Allison v. State, 331 So.2d 748 (Ala.Cr. App.), cert. denied, 331 So.2d 751 (Ala. 1976).”
Thomas v. State, 473 So.2d 627, 629 (Ala. Cr.App.1985). Here, there is no evidence that the State called Helton with the purpose or design of having the jury observe Helton invoke his Fifth Amendment right against self-incrimination.
However, the law with regard to the questioning of witnesses who have invoked their Fifth Amendment privilege against self-incrimination in a refusal to testify is found in the United States Supreme Court decision in Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), wherein that Honorable Court wrote as follows:
“We decide today that the Confrontation Clause of the Sixth Amendment is applicable to the States. Pointer v. Texas, ante 380 U.S. p. 400 [85 S.Ct. p. 1065, 13 L.Ed.2d p. 923 (1965)]. Our cases construing the clause hold that a primary interest secured by it is the right of cross-examination; an adequate opportunity for cross-examination may satisfy the clause even in the absence of physical confrontation. As the Court said in Mattox v. United States,
“ ‘The primary object of the constitutional provision in question was to prevent depositions or ex parte affidavits ... being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.’ 156 U.S. 237, 242-243 [15 S.Ct. 337, 339-40, 39 L.Ed. 409 (1895) ].
“See also 5 Wigmore, Evidence §§ 1365, 1397 (3d ed. 1940); State v. Hester, 137 S.C. 145, 189, 134 S.E. 885, 900 (1926).”
Id., 380 U.S. at 418-19, 85 S.Ct. at 1076-77. This ruling is, of course, controlling as to *588 this point. Indeed, it was recognized as dispositive of this issue by Alabama courts in the case of Shockley v. State, 335 So.2d 659 (Ala.Cr.App. 1975), aff'd, 335 So.2d 663 (Ala.1976). In Shockley, this court stated that regardless of whether the witness had waived his immunity from testifying, so that he could not lawfully refuse to testify, where he did continually refuse to testify during extensive questioning, the fact that his Fifth Amendment claim may not have been valid did not remove the prejudice from such questioning. Id,., 335 So.2d at 662. In essence, we held that it is not the witness’s right which is in question, but rather, the right of a defendant to a fair trial which is at the crux of such a matter.
The facts of this case are remarkably similar to those in Douglas and Shockley. In each case the State called an accomplice of the accused to testify. In each case the accomplice had made a statement incriminating the accused. In each case the accomplice, when asked about his statement, refused to answer. In each case the accomplice’s statement was read back to him, in front of the jury, in the form of questions. In each case the accused was convicted. As was the case in Douglas and Shockley, there is no doubt here that the “questioning” was only a guise under which the prosecutor could offer to the jury prejudicial innuendoes and inferences which would otherwise not have been allowed into evidence. The trial court erred in allowing such to occur. As we stated in Shockley, 335 So.2d at 662:
“[T]he prosecutor’s persistent confrontation of the witness ... with multiple questions ... even though the prosecutor [knew] that [the witness] would not testify, supports a reasonable inference that the prosecution preferred to parade these questions before the jury, thereby impressing them with innuendoes and inferences of guilt prejudicial to defendant.
“The trial court committed error in permitting such interrogation, although no answers were made, if for no other reason than that the defendant under such tactics was denied confrontation, a right of cross-examination, assured under the Sixth Amendment to the U.S. Constitution.”
Although this practice may not have amounted to prejudice if the questions had concerned only information which was cumulative in nature, Thomas v. State, supra, 473 So.2d at 630; Busby v. State, 412 So.2d 837, 843-44 (Ala.Cr.App.1982), this is clearly not the case here. In this case, the prosecutor’s questions implied that appellant was a much more direct participant in the crime than had been suggested by any of the previous evidence. Moreover, the facts in Thomas are distinguishable from those in the case at bar, because in Thomas the prosecution made no mention of any statement which the accomplice/witness may have given. The prosecutor neither attempted to capitalize on the witness’s invocation of his privilege, nor did he attempt to read the witness’s statement to the jury under the guise of questioning. Thus, the State’s reliance on our decision in Thomas in misplaced.
Here, just as in Shockley:
“The defendant did not invite or instigate the refusal; he had to sit with his hands tied while the parade of innuen-does and inferences went on and was denied by such procedure the right of cross-examination. The only thing the defendant could do was to object, which he frequently did, and suffer the consequences.”
Shockley v. State, supra, 335 So.2d at 662. Thus, the trial court erred in overruling appellant’s repeated objections and in permitting such questioning to continue before the jury. Examination of this witness should have ceased, at least in the presence of the jury, as soon as it became apparent that this witness intended to invoke his Fifth Amendment privilege.
Accordingly, this case is hereby reversed and remanded.
REVERSED AND REMANDED.
All the Judges concur except BOWEN, J., concurs in result only.